# PUTNAM v. INDUSTRIAL COMMISSION et al.

No. 5222.   Decided October 6, 1932.   (14 P. [2d] 973.)

N. H. *Tanner,* of Salt Lake City, for plaintiff.

*Geo. P. Parker, Atty. Gen.,* and *L. E. Cluff,* of Salt Lake City, for defendants.

STRAUP, J.

This is an industrial case. Chew, the applicant, was injured in Salt Lake City on the night of January 8, 1931. The controversy involves the question as to who was his employer and whether at the time of the injury he had three or more workmen in his employ. On January 21, 1931, a report by the physician who attended the applicant was filed with the commission setting forth the nature of the injury and giving L. A. Putnam as the employer. On January 27, 1931, the applicant filed a written application with the commission seeking compensation, and alleged that Lawrence Putnam was his employer, and that he, at the time of the accident, had three or more workmen in his employ. Four days before the application was filed, and on January 23, the chairman of the commission wrote a letter to "L. A. Putnam, *Manager of the City Waste Paper Company*" (italics added) stating that the commission had been advised that Chew was injured January 8th "while employed by the City Waste Paper Company," and that "on said date you had in your employ three or more workmen," and that "we are surprised to learn that you are again operating in violation of law after having had repeated warnings from this Commission," and that "you have apparently made up your mind to absolutely defy this Commission and purposely

violate the law," that "you arrange to appear before this Commission on Tuesday, January 27, 1931," and "in case of your failure to appear we will take immediate steps to have the County Attorney proceed against you as by law provided." In response thereto, a day or two thereafter, and before the application was filed, Putnam exhibited to the chairman of the commission a written contract entered into January 5, 1931, between the City Waste Paper Company by L. A. Putnam, its manager, and F. D. Gray, by the term of which the business of the City Waste Paper Company was taken over and to be operated by F. D. Gray, who, as claimed by Putnam, thereafter and on January 8th operated the business, and that Chew at the time of his injury was not in the employ of the City Waste Paper Company or of Putnam, but was in the employ of Gray. The chairman of the commission, on reading the contract, stated the contract did not mean anything to him, and "I am going to give you the full extent of the law."

The case, known as No. 2704, came on for hearing February 16, 1931, Chew being represented by counsel and Putnam by counsel, the one contending that Putnam was the employer, the other that Gray was. Evidence was given on behalf of the parties, at the conclusion of which the commission took the matter under advisement, and on May 4th made findings, conclusions, and an award in favor of the applicant. With respect to the issue in controversy, the commission found:

"I. On the 8th day of January, 1931, the applicant, John G. Chew, was employed by the City Waste Paper Company; the business of the City Waste Paper Company is owned and conducted by L. A. Putnam; on said date the said City Waste Paper Company and/or L. A. Putnam had in their employ three or more workmen and had failed to provide Workmen's Compensation insurance as provided in section 3114, subsection 2 of the State Industrial Act.

"II. The applicant, John G. Chew, on January 27th, 1931, pursuant to section 3130 of the State Industrial Act, filed with the Industrial Commission of Utah an application for compensation for injuries sustained by him on January 8th, 1931, while employed by

the City Waste Paper Company and/or L. A. Putnam, in lieu of proceeding against his said employer by civil action in the courts, as in said section provided. * * *

"VI. The defendants herein, through their witness, L. A. Putnam, attempted to establish that on or about January 5th, 1931, a contract was entered into between the *City Waste Paper Company and/or L. A. Putnam and one F. D. Gray.* The Commission finds that this contract was entered into with the express purpose of attempting. to defeat this proceeding and to avoid any liability that might result to the applicant from said injuries for the reason that the evidence disclosed that L. A. Putnam still managed and conducted said business and collected the amounts due from its customers. No reliance is placed upon the testimony of L. A. Putnam and F. D. Gray relating to said alleged contract because of the unsatisfactory nature and conflict of their testimony.

"VII. In making a portion of the above findings and more particularly that part dealing *with the ownership of the City Waste Paper Company, consideration has been given to the testimony taken in the case of LeRoy Hanks vs. City Waste Paper Company and/or L. A. Putnam, Claim No.* 2721, for the reason that the situation relating to this particular point is similar in both cases." (Italics added.)

As conclusions of law, the commission, "in view of the foregoing findings," stated that Chew, "on the 8th day of January, 1931, was injured by reason of an accident arising out of or in the course of his employment while employed by the City Waste Paper Company and/or L. A. Putnam, an employer subject to the provisions of the State Industrial Act and who had failed to comply with the provisions" of the act in respect of carrying liability insurance, and that the contract between "Gray and the City Waste Paper Company and/or L. A. Putnam, wherein it was attempted to make F. D. Gray an independent contractor is a mere subterfuge designed to evade and defeat the provisions of the Workmen's Compensation Act." Accordingly, an order was made that the "City Waste Paper Company and/or L. A. Putnam" pay Chew at the rate of $10.38 a week for a period of 15 4/7 weeks, amounting to $161.63 in a lump sum, on account of temporary total disability and to continue the payment of $10.38 per week to such time as the applicant has

been discharged by his attending physicial as surgically healed, and, in case of permanent loss of bodily function, the case be reopened and testimony taken to determine the amount of compensation to be paid on account of further temporary or permanent total disability; and $186.50 for hospital and medical expense. Fifty dollars attorney's fees were allowed the applicant's attorney to be deducted from the award. It was further ordered by the commission that, in case either party was dissatisfied with the decision, and desired to be further heard in the proceedings or to appeal from the decision, an application for a rehearing be filed with the commission within 10 days from the mailing of a copy of the decision to the parties. But at the same time and on the same day of rendering the decision, May 4, 1931, the commission filed an abstract of the judgment in the clerk's office of Salt Lake county directing the clerk to issue execution and the sheriff of Salt Lake county "to make demand upon the City Waste Paper Company and/or L. A. Putnam for the amount of the award," and, if the amount was not paid promptly, to levy on sufficient property to make the amount of the judgment.

Thereafter, and on May 12th, within 8 days after the decision was rendered, a motion for rehearing was filed by Putnam and the City Waste Paper Company, which, on the same day, was denied. But thereafter, on written stipulation of the parties, the commission on May 20th vacated the order denying a rehearing, and granted a rehearing for the purpose of presenting further evidence "as to the ownership and operation of the City Waste Paper Company," and as to who was the employer of Chew at the time of his injury. Such further hearing was had *July 6, 1931,* at which time further and additional evidence was given on behalf of the defendants on the subject to which the rehearing was restricted. No further evidence was given on behalf of the applicant. At the conclusion of that hearing, the matter was again taken under advisement until *August 12, 1931,* when the original order and award made on May 4 without

further findings was affirmed, except the statement that the evidence adduced on the rehearing "was insufficient to justify a change" of the findings, conclusions, or order made May 4th.

On application of Lawrence Putnam, sometimes referred to in the record as L. A. Putnam, and of the City Waste Paper Company, we granted a writ of certiorari to review the proceedings had before the commission. It is claimed by them that findings I, II, VI, and VII, made on the first hearing and reaffirmed on the second, and the conclusions reached and the award made, are not supported by and are against the evidence. In response to the writ, all the evidence adduced on both hearings and as stenographically reported is certified to us by the commission.

On the first hearing it was shown without dispute that in February, 1924, in pursuance of Comp. Laws Utah 1917, § 4005, Mrs. L. A. Putnam, the wife of Lawrence Putnam, and Edith Putnam, since married, the stepdaughter of Mrs. L. A. Putnam, filed a joint affidavit in the office of the county clerk of Salt Lake county, and as by such section provided, by which, among other things, it was averred that the affiants had commenced and that it was their bona fide intention to commence and carry on business in Salt Lake City under name of "City Waste Paper Company," not incorporated, and that they were the sole and only members of the company and the proprietors and owners of the business. The filing was made on a printed blank furnished them by the county clerk, and was in full compliance with the statute in such case made and provided. A certified copy of the affidavit and of its filing was put in evidence.

The business so carried on consisted of removing and hauling away for hire for business houses, private companies, and persons in Salt Lake City, chiefly in the business districts, waste paper, ashes, rubbish, etc. The city did not have anything to do with it. The arrangement and payment for the work were entirely between the City Waste Paper Company and the houses and persons for whom the

material was hauled away. From the filing of the affidavit in 1924 and until January 5, 1931, L. A. Putnam was the manager of the company and designated as such, and as manager hired and discharged the workmen and had full charge of and managed the business. He was paid a salary of $80 a month. On January 5, 1931, a written contract was entered into between the City Waste Paper Company by L. A. Putnam as manager, the party of the first part, and F. D. Gray, the party of the second part, by the terms of which, for a period of one year from January 5th, Gray took over the business and assumed the responsibilty of its operation, the first party to furnish the necessary equipment, including trucks, wagons, teams, gas, oil, and horse feed and necessary repairs, and to receive therefor one-half of the proceeds of the business; the second party to perform the work in a workmanlike manner, to keep the route clean, and be responsible for the faithful performance of the work and of any and all of his employees, and was to receive the other one-half of the proceeds of the business. The contract was witnessed by Mrs. Putnam and was put in evidence.

The applicant was called as a witness by the commission, and in chief was examined by the chairman. After stating his name, he was asked by the chairman:

"Q. You are the party who made application to the Commission for compensation? A. Yes sir.

"Q. In that application you allege that on the 8th of January, 1931, you were injured while employed by Lawrence Putnam? A. Yes.

"Q. When were you employed by Lawrence Putnam? A. I worked for him all summer and I was off a couple of weeks and then he came back after me on the 24th of December, and I was working for him until I got hurt."

The witness was then asked and answered as to the character of work performed by him, that he was to be paid at the rate of $80 a month and the junk, which amounted to about $90, and that Putnam paid him sometimes by check and sometimes in cash; that Putnam owned the team and wagon, and, when asked how he knew that, he answered

that Putnam told him he had bought the team from his brother. When asked what other men were working for Putnam, he answered that "Miles was working," but not on the night that Chew got hurt, and that "they had three men working all summer"; that Gray was hauling ashes in December, but the witness could not say what other men were working in the daytime.

"Q. Do you know whether he (Gray) was an employee of Mr. Putnam? A. He was for a while.

"Q. What was he doing when you were hurt, if you know? A. That night at the Granite Hotel he says 'Shorty (Chew) I have a proposition to make to you; I am going to take this over and I will give you $70.00 a month'; that was on the 7th. I says 'I will study it over and let you know tomorrow the 9th,' and the morning of the 8th I got hurt. (The record without dispute shows that he was hurt on the night of the 8th.)

"Q. Just what did he say? A. 'Give you $70.00 per month.'

"Q. Did he say he was going to buy out Putnam? A. No, he didn't say.

"Q. But he did tell you he was going to take it over? A. He says he was going to take it over on a contract.

"Q. The man that was working with you was Miles? A. Yes.

"Q. How much was he paid? A. I could not say what Gray was going to give him.

"Q. Outside of Miles and Gray and yourself were there any other employees? A. Not that night."

The witness further testified that during the month of December or January there were two employees at night and one in the daytime; that Gray told him and his wife on December 4th that he had a contract on a fifty-fifty basis, but corrected that by saying such statement was made February 4th, after he was hurt. He further testified that "on the night" he was hurt, January 8th, and for some time prior thereto, Gray in the daytime hauled ashes, and that Miles and the witness were on the wagon at night; but he did not know what the relation was between Gray and Putnam. He further testified that Putnam paid his wife for services which he had rendered up to and including the night of the 6th; that he did not know that Putnam had given up

the work, and that Gray was going to take it over, until "Gray made the proposition to me on the night of the 7th that he was going to take it over and made me the proposition at that time of $70.00 per month and I was to consider it; he didn't tell me that he had taken it over, but that he was going to take it over." He further testified that Hanks was also working with him, and that Hanks got hurt on the night of the 6th of January. Later he said it was on the night of the 5th, and then said he was not sure whether it was the night of the 5th or the 6th (Hanks testified and the record shows it was on the night of the 5th), and that Putnam then got Miles to take Hanks' place, and on the night of the 7th Gray told him that he was going to take the business over and wanted Chew to work for him at $70 per month; "he didn't say that he had taken it over, but that he was going to take it over."

The commission called Gray, who also was examined in chief by the chairman of the commission. In response to questions propounded to him, he, in substance, testified that the contract between him and the City Waste Paper Company was entered into January 5, 1931; that prior to January 5 he was hauling ashes and cleaning up on a fifty-fifty basis with Putnam, who furnished the truck or team, and that whatever he got out of a job was split; that he practically was working for himself; that, if he got $3 out of a load, he took $1.50 and Putnam $1.50. He further testified in response to questions asked him by the chairman that, when the contract was entered into between him and the City Waste Paper Company, no understanding was had as to who was to pay injured employees, and not anything was discussed or said on such a subject. He was asked if the contract was not entered into between him and Putnam to avoid the workmen's compensation insurance. He answered that it was not; that no such matter was mentioned. He further testified that Chew was working for him the night he was injured; that he was responsible for the operation of the business and for the wages of the men

he employed; that he had not invested anything in the business, simply had the contract taking over the business; that Putnam designated the kind of equipment he was to use, and directed him where to go and take up the waste paper and ashes and other things until he learned the route, but that he had the right himself to select the route; that he got the names of the customers from Putnam and got two new names from him. He further testified that on the night of the 6th at the Walker store, and after loading ashes, Chew jumped on the truck and said, "Well, I understand you are taking this over"; that Gray replied in the affirmative and told Chew he would give him $70 a month, and that Chew said, "I'll see"; that he "took it (the business) over on the 5th, but it was on the night of the 6th that Chew told me—he jumped on the car and he says, 'Gray, Putnam told me you were taking this over,' " and that Gray replied he had and that he would pay him $70 a month. He further testified he did not know whether the contract was entered into before or after Hanks got hurt, that the contract was entered into on the 5th, but he did not know just when Hanks was hurt. (Hanks testified he was hurt on the night of the 5th; the contract was entered into on the afternoon of the 5th.) He further testifeid that those for whom he hauled the material paid him, that the customers paid monthly for whatever work was done for them, and that at the time of the hearing (February 16th) he had not yet collected from them. When asked who the City Waste Paper Company was, he replied, "Mr. Putnam," but in that connection further stated Putnam did not tell him he owned the business, and all he (Gray) knew about it was what some one had told him. Gray further testified that he held no stock in the company (it was not a stock company), and that he had not invested anything in the company, and that all the interest he had was what he acquired by the contract; that the equipment consisted of two trucks, two teams, and two wagons, all of which had been used for some time; that the amount received from the customers would run around

$450 a month, of which, when collected, Putnam was to receive one-half and Gray one-half, Gray to operate the business, hire and pay all the workmen; and that from the execution of the contract until the hearing he had hired and paid all the workmen.

Miles was also called as a witness and examined in chief by the chairman of the commission. He, in substance, testified that he started to work for Putnam about December 29, 1930, and worked for him until the 5th or 6th of January, 1931; that he had no set wage, but was allowed so much a load for unloading wagons, and after that time he worked for Gray and was paid at the rate of $70 per month; that on the night of the 6th Putnam told him Gray had taken the business over and that he did not need him any more.

Hanks, also called by the commission and examined by the chairman, in substance, testified that he was injured on the night of the 5th of January, and did not work after that; that he was working for Putnam. "Q. Is that the City Waste Paper Company? A. Yes sir. So far as I know; I hired out at the employment office," and was to get $80 a month and went to work just before or just after Christmas; worked about ten days and was paid $18 for the time he put in and that there was still $6 due him; that his injury consisted of "a strain" in lifting and was laid up for 8 days; that he notified Putnam of his injury, but Putnam did not do anything for him. (Thereupon the chairman of the commission informed him that he had the right to elect to sue Putnam for his injury or to apply to the commission for compensation.) The witness further testified that, during the time he worked until he got hurt, Gray, Chew, Miles, and himself were employed by Putnam, but that he did not know what relation there was between Gray and Putnam.

Putnam was called as a witness in his own behalf, and, in substance, testified that the City Waste Paper Company consisted of his wife and Edith Putnam, now Mrs. Hogan, and as shown by the certificate and affidavit filed in the

office of the county clerk; that the business belonged to them; that he had no interest in the business, except as manager of the company; that he owned one truck; and that the rest of the equipment belonged to the company; that on January 5th a contract was entered into between the City Waste Paper Company, by himself as manager, and Gray, as shown by the contract, and that, after that he did not have anything to do with collecting money or with hiring, paying, or discharging the workmen, and had no responsibility over the operation of the business; that on the night of January 5th he told Chew and Miles that he was going to turn the business over to Gray, and on the night of the 6th he took them to meet Gray, since which time he had nothing to do with the route.

He was cross-examined by the chairman of the commission. In response to a question propounded as to whether the witness "was not up here before this case where a man was injured," and that "you didn't have any insurance," to which counsel for the defendant stated that some time in May, the year before, the commission on a hearing found that to be the case. Then, in response to a further question by the chairman of the commission, Putnam testified that he on that occasion and at that time stated he was the manager of the company; the same owners then as now; and that he was paid a salary of $80 a month.

"Q. So you are employed by them (the company) on a salary basis? A. Call it a salary basis.

"Q. You are an employee of the company. The City Waste Paper Company employs you as manager? A. You may call it that way. * * *

"Q. How many days after Hanks was hurt did you enter into this contract with Gray? A. Along about that time, we put the proposition over before that.

"Q. The contract was not signed until after Hanks was injured? A. If he was hurt on the 5th it was not, no."

But he further testified that the contract was entered into about 4 o'clock on the afternoon of the 5th. He would not

say whether the 5th was on Saturday or not, but that Hanks was injured on the night of the 5th about 9:30 or 10 o'clock.

"Q. You are absolutely sure beyond any question of doubt that this contract was not entered into until after he (Hanks) was hurt? A. Until after Hanks was hurt?

"Q. Yes. A. Yes, sir.

"Q. How do you know that? A. Because I have talked it over even before the first of the year, Mr. Gray and I.

"Q. How do you know it was actually signed before Hanks was hurt? A. If Hanks was hurt on the 5th the contract was signed when he was hurt.

"Q. You are sure of that? A. Yes, because the contract was signed before Mr. Gray went home that night," and that the contract was signed on the same day stated in the contract; that the contract was drawn by counsel along the first of the year, and that they had talked the proposition over before that; that the contract was en- terer into in good faith and not to avoid or evade any provision of the Workmen's Compensation Act.

### The chairman of the commission further asked:

"Q. As I understand your testimony this company is composed of three partners and you aren't one of them? A. No.

"Q. Your employment is monthly? A. Yes.

"Q. So the day Mr. Hanks was hurt you were one of them, and you had three men, is that correct? A. I had Hanks and Chew.

"Q. And Miles? A. All right, if you want Miles.

"Q. You employed him to do the work you had to do? A. Yes.

"Q. So there were four men; eliminating Miles, there would be three men including yourself? A. All right."

He was further asked if he had been employed as man- ager after the hearing had in May, and the witness an- swered:

"Yes.

"Q. Didn't you indicate to our secretary a short time after that that you had quit the company? A. I guess you are mistaken. I came up here and asked the Commission about letting this paper out on a contract. I came up here to see them, and they said it would be all right.

"Q. But really didn't do that until after Hanks was hurt? A. Yes, I had an understanding with Chew and Anderson, they were to take it on a tonnage basis.

"Q. But you hadn't signed up? A. No. but we all agreed to it."

In response to further questions asked, he answered that he at no time had three employees when Miles was not employed and that he did not count himself as an employee. He further answered he was still the manager of the City Waste Paper Company, so far as looking after the equipment, making repairs, buying gas, and feed for the horses, but otherwise was not in the employ of the City Waste Paper Company, and had no salary from the company after the contract was entered into. He further testified that he made the contract with Gray "just on business relations," and that he had expected to leave in the summer, that after the contract was entered into and signed Gray took over the business, and thereafter hired and paid all the workmen including Chew, and since that time neither Putnam nor the paper company had anything to do with hiring or paying the men, and that at the time of the injury Chew was in the employ of Gray.

Such, in substance, was the evidence adduced on the first hearing and on which the findings and conclusions heretofore referred to were made. The second hearing was held July 6, 1931, at which time further and additional evidence was given on behalf of Putnam and the City Waste Paper Company. Mrs. Putnam, who gave no testimony on the first hearing, in substance, testified as to the filing of the affidavit in the county clerk's office in 1924, and that there was no change in the ownership of the business since the filing of the affidavit; that the contract between the City Waste Paper Company and Gray was signed January 5th; that it was read over and witnessed by her as it was signed, and since then Putnam had nothing to do with the operation of the business, and was not the manager of the company; that before the signing of the contract she had intrusted the business to her husband, and that he managed and conducted it for her; that she depended upon him and was not familiar with the details of the business, and in carrying

out the terms of the contract she depended upon him and Gray; that she kept a record of the names of the customers, sent them bills, and indorsed all checks received and on the books credited the amount of moneys paid by the customers, but kept no books as to the moneys paid out which were paid out as fast as they were collected; that she did not know whether Putnam or Gray paid for the feed of the horses, as her husband managed things for her, and that she herself paid no bills for feeding horses or for repairs of the trucks; that Gray paid such bills; that she did not know much about the conduct of the business, except as provided by the contract, and that she left the performance of it to Putnam and Gray, and "I didn't know much about it because I left it to them"; that the City Waste Paper Company owned the equipment consisting of horses, wagons, and trucks when paid for, except one old truck which belonged to Putnam; that Gray had not submitted any report to her; that he and Putnam ran the business according to the contract; that she understood that she and her stepdaughter were responsible for any injury occurring prior to entering into the contract, but not for an injury which occurred thereafter; and that the injury to Chew occurred after the contract was entred into and the business taken over by Gray.

Putnam was also again called. His testimony was substantially as given on the first hearing; that the negotiations leading up to entering into the contract were commenced about the middle of December; that Gray wanted Cunningham, who worked for the company prior to December 10th, to go in with him; that the contract was in fact entered into on the 5th of January, and on the night of the 6th Putnam told Chew and Miles that he had nothing more to do with the business, and that they would have to look to Gray; that Chew stated he did not like the idea of Gray cutting the wages and taking all the junk; and since that time Putnam had not anything to do with the employment or payment of the men or directing the route, only to keep

up the equipment, pay for the gas and oil, and feed for the horses which Gray's workmen fed and cared for; and that he had nothing to do with hiring the workmen. He further testified that since January 5th he collected some of the accounts at Gray's request; some of the checks came to the house (which also was the office of the company), and that all such checks were indorsed by Mrs. Putnam, and then Gray came for them or else they were delivered to him; that moneys coming to the house or collected by Gray were split, one-half to Gray and one-half to Putnam; that he collected some of the accounts when Gray was busy and asked him to collect them; that the moneys collected and paid to Putnam went into the business in keeping up the equipment, and that he reported none of such moneys to the wife or her stepdaughter; that he had other business, landscaping, at which he worked during January and February soliciting orders for fertilization, etc., and, when he was not doing anything, Gray asked him to collect bills, but he was not paid anything for that, and did it only at Gray's request and for his accommodation. Putnam further testified that a day or so after he got the letter from the commission written January 23d he handed the contract between the paper company and Gray to the chairman of the commission, stating that "I guess this will explain all the matters to you," and that the commissioner looked at the contract and said, "This doesn't mean anything to me; I am going to give you the full extent of the law." That, nor anything else testified to on the rehearing, was denied by any one.

Cunningham was also called and testified that he worked for the City Waste Paper Company in the forepart of December, 1930; that about the middle of December, and at other times thereafter, Gray talked to him about going in with him in taking over the business, and after that he saw Gray coming out of Putnam's house with the papers, and that he stated it was all signed up, and that he had taken the business over, which occasion, as he testified to, was before Chew was hurt.

Miles also gave further testimony, in the main a repetition of what he testified to on the first hearing, that at the time Chew was hurt he was working for Gray, that Gray paid him, and that he was paid up to January 6th by Putnam, and thereafter he was paid by Gray, and that on the night of the 6th Putnam took him and Chew to Gray, and that at that time Gray employed him at $70 a month without junk; that Gray told him he had taken over the business, and that Putnam told him that he (Putnam), did not have anything more to do with it, and after that time the witness was under Gray's direction and was paid by him.

Another witness, Stanley Johnston, a stepson of Gray, testified that on the night of January 5, 1931, Gray brought the contract in question to the house, and that the witness and other members of the family read it, and that Gray then took over the business and operated it; that on the night of the 8th, when Chew was hurt, the witness went to work for Gray and worked for him ever since, and was paid by him, and that during that time he and another were the only employees of Gray; that Gray also worked, and, the first night the witness worked, Gray showed him the route.

Gray also was called and further testified that about the middle of December he and Putnam began negotiations with a view of taking over the business, and that he tried to get Chew or Cunningham to go in with him, but that they did not know how long they would be there, and for that reason they did not desire to join in the business; that the contract was in fact entered into January 5th, and that he took the business over January 6th, and that he told Chew on the night of the 5th that he had taken the business over; that it was that night that Chew told him that Putnam stated to Chew that Gray had taken the business over, and that Gray told Chew he would pay Chew $70 a month without the junk. He further testified that immediately after the first hearing Chew said to him, "Gray, I don't want you or Putnam to be sore at me, this is not my fault; I don't want to make either one of you trouble," and that it was his wife's fault, that

she forced him to say what he did. The witness further testified, as he did on the first hearing, that Chew was employed by him and was in his employ at the time of the injury; that most of the "proceeds" came to the house of Mrs. Putnam (the place of the company's office), and that she indorsed the checks and gave them to him; that Mrs. Putnam made out bills, and that he collected them, and, when he did not have time to do so, he asked Putnam and Mrs. Putnam to collect some of the bills; that Mrs. Putnam had a list of the customers, which list was furnished him; that he had the right to fix the price with the customers as he saw fit without consulting Putnam; and that there was no accounting of profits, only that the money when collected was distributed, and was to be distributed 50 per cent to him and 50 per cent to Putnam.

In response to several questions asked Gray and Putnam by the chairman of the commission, if the contract was not entered into to avoid taking out insurance and to avoid insurance liability, each emphatically answered that such was not the purpose of entering into the contract; that nothing of that kind was mentioned or discussed by them, and that the contract was entered into in good faith and to relieve Putnam from "crawling out nights and taking the place of men who wanted to lay off"; that they had no ulterior motive in entering into the contract, and had no idea whatever of the happening of any accident when the contract was entered into. The chairman of the commission further asked Putnam:

"Q. What purpose did you have in entering into this contract, did you have anything in mind? A. All I had in mind I was going to try to get more day work, as much as I could get.

"Q. Didn't you testify at the other hearing that the main purpose in this was that you intended to go to California? A. I never said nothing about California.

"Q. At the other hearing? A. I never said nothing about California.

"Q. Absolutely? A. Absolutely nothing about California," and in that the witness is corroborated by the record of his testimony given on the other hearing.

On the second hearing of the Chew case, the chairman of the commission stated for the record that between the first hearing of the Chew case on February 16th and the second hearing on July 6 "the Hanks trial was had on March 16" (about a month and a half before the findings ██ were made on the first hearing of the Chew Case), but against what defendant or defendants was not stated or otherwise made to appear. What the evidence or any part thereof was in the Hanks case was not in any manner made evident nor referred to or brought in the Chew case either on the first or on the second hearing. If, for any reason, it was desired to consider in the Chew case testimony of any witness in the Hanks case, such testimony ought to have been put in evidence in the Chew case. Because adduced in a different cause and between different parties, it could not without consent be put in evidence in the Chew case as primary evidence of facts testified to in the Hanks case. Since such evidence in no manner was brought in the Chew case, the commission was unauthorized to consider it in making findings therein. That is fundamental. To permit such a practice would render wholly uncertain what was considered by a tribunal in making findings. In reviewing a record of the commission and in considering the question of sufficiency or insufficiency of the evidence to support the findings and the award, we eliminate, as has been repeatedly held by us, all incompetent evidence received by the commission, and determine the question alone upon the competent evidence. While in such case it ordinarily by the record is made to appear what the incompetent evidence was and thereby some means afforded to determine to what extent such evidence may or may not have influenced the findings and the award, yet ordinarily we merely eliminate such evidence without considering to what extent it may or may not have influenced the findings or the award. But here we have a direct finding (finding VII) of the commission that in making the material findings referred to—findings directly relating to the real issue

in the case—the commission took into consideration testimoney taken in a different cause and between different parties without bringing or attempting to bring such testimony in this cause. It thus expressly is made to appear that a material finding or findings were, in part at least, based upon an unauthorized consideration of testimony. When such is made to appear and that the commission considered something not in evidence in the cause, we cannot approve such a finding nor an award based upon it.

Still, how stands the case when considered alone upon the evidence adduced and received in the cause? Though the case be considered from the viewpoint that the business of the City Waste Paper Company was the business of Putnam himself, or from the viewpoint that he was only the manager of the business owned by others, yet the evidence does not support a finding that Chew at the time of his injury was in the employ of either Putnam or of the City Waste Paper Company; nor in such connection is the further finding or conclusion supported by sufficient evidence that the contract entered into between the paper company and Gray "was entered into with the express purpose of attempting to defeat this proceeding and to avoid any liability that might result to the applicant from said injuries," and for which he sought compensation; nor is the further conclusion sufficiently supported that the contract was "a mere subterfuge designed to avoid and defeat the provisions of the Workmen's Compensation Act." That the contract in fact was entered into and was signed January 5th, 3 days before Chew was injured, is shown without dispute. That was testified to by Putnam, Mrs. Putnam, Gray, Johnston, and Cunningham. Such fact is not denied by any one. The commission did not find that the contract was not entered into at that time and before Chew was injured. What the commission, in the nature of a conclusion, found was that the contract was entered into "to defeat this proceeding" and to avoid liability to the applicant for "said injuries" sustained by him. Such a conclusion rests merely

on conjecture and speculation without sufficient evidence to support it. The contract having been entered into January 5th and no finding of the commission to the contrary, it is difficult to conceive how the contract was entered into to "defeat this proceeding," a proceeding instituted January 27th for an injury sustained January 8th, or how the parties when they entered into the contract anticipated or could anticipate any injury to Chew. Putnam, Mrs. Putnam, Gray, Miles, and Johnston testified that, upon the signing of the contract, the business in pursuance of the contract was thereafter operated by Gray, and that he thereafter employed and directed the men in their work, and that Chew, when he was injured, was in Gray's employ. There is no substantial evidence to dispute that. True, in response to a leading question asked the applicant, he answered that in his application he alleged he was injured "while in the employ of Lawrence Putnam," and in response to a further question, which assumed he was in his employ, he was asked when he entered the employ of Putnam. He, however, testified that on the night of January 7th Gray told him he was going to take the business over on a contract, and that he would pay him $70 a month, but the applicant did not know what Gray was going to pay Miles, the only other workman on the job, if the business was taken over by Gray. Hanks was injured on the night of the 5th, and, as he testified, was not on the job on the 6th, 7th, or 8th or at any time thereafter. He further testified he was in the employ of Putnam on the day he was injured, which was the same day the contract was signed. Such testimony does not dispute the fact that the contract was entered into on the 5th and the business taken over by Gray on the 5th as testified to by some witnesses, or on the 6th, as testified to by other witnesses. Both can be true without any conflict in the evidence.

In considering the testimony of the applicant on the issue as to whose employ he was in, we must look, not alone to the answers made by him to leading questions, or on assump-

tions that he was in the employ of Putnam, but to the whole of the testimony bearing on the subject. As to that, the familiar rule is applicable that testimony of a witness on his direct examination is no stronger than as modified or left by his further examination or by his cross-examination. A particular part of his testimony may not be singled out to the exclusion of other parts of equal importance bearing on the subject. Considering the applicant's testimony alone, he may have assumed, when he was injured, that he still was in the employ of either Putnam or of the City Waste Paper Company, for the reason that, as he testified, Gray only told him he was going to take the business over and did tell him that he had taken it over, and while Gray, as the applicant testified, offered to pay him $70 a month and the applicant said he would consider it, or would see about it. But such assumption or inference, however reasonably assumed or deduced, does not dispute the evidence or raise a conflict therein, that the business in fact had been taken over by Gray prior to the applicant's injury.

We also are of the opinion that the finding that on January 8th the business of the City Waste Paper Company was "owned" by Putnam likewise is not supported by sufficient evidence. There is no dispute that in 1924, about 7 years prior to any of the transactions here involved, Mrs. Putnam and her step-daughter, by a proper filing of record, declared and gave notice to the public that they were the sole owners and proprietors of the business to be commenced and carried on in Salt Lake City under the name of City Waste Paper Company. Such certificate or affidavit, as declared by the statute, section 4005, supra, is prima facie evidence of the facts therein recited. The purpose of the filing of such affidavits or certificates is to give notice to the public as to the name or names of the persons conducting and owning the business and to protect those who transact business with persons under the assumed name. No claim is made nor is there anything to show that

such filing was made for any ulterior purpose, nor for a purpose other than or different from what the filing itself purports to be, or as a cloak to shield another. Mrs. Putnam testified that she put her own money in the business from moneys left her by her first husband. Under that name the business for 7 years was carried on until January 5th, when the contract was entered into by and between the City Waste Paper Company by Putnam as manager and F. D. Gray. Until then Putnam conducted and managed the business, and hired, paid, and discharged the workmen employed in the business. He did that, as manager of the company and to whom the handling of the business was intrusted. The testimony of those that, when they went to work prior to January 5, 1931, Putnam hired, paid, and directed them in the work, is not inconsistent with other testimony that he was only the manager and not the owner of the business. As well say that a manager in fact of any company or corporation who hires men, pays and directs them in the work, and conducts and manages the business, is the owner of it, or because they assume he is the owner does not make him so.

The question asked Gray by the chairman of the commission, "Q. Who is the Salt Lake Waste Paper Company or the City Waste Paper Company?" and the answer made by him, "A. Mr. Putnam," called for a decision of an ultimate issue to be decided by the commission and not by the witness; the answer made without a showing of what knowledge on the subject was possessed by the witness has no substantial probative value as against the testimony of those who possessed knowledge; and then the answer was materially modified, if not destroyed, by further testimony of the witness that all he knew about it was what some one had told him, and that he did not know whether the equipment belonged to Putnam or not. It is clear such an answer, without a showing of knowledge on the subject, where the question of ownership is one of the material issues in the case, can have no probative value as against testimony of

those possessing knowledge of the fact, nor would a tribunal be justified in rejecting the testimony of those shown to possess knowledge and base its findings on testimony of one not shown to have knowledge of the fact testified to. And then by the contract which indisputably was entered into January 5th, "the City Waste Paper Company, by L. A. Putnam, Manager," the party of the first part, was characterized as the principal, and in such capacity signed the contract. Thus, when the whole of the testimony (is considered—as the commission was required to consider it —and undue weight not given to mere snatches of it to the exclusion of other evidence of equal if not greater importance, it is clear no finding is justified that the City Waste Paper Company was "owned" by Putnam, or that the business after January 5th or 6th was operated by him or by the City Waste Paper Company.

Aside from all this, by the frequent misuse of the words "and/or" in the findings and in the judgment, both are rendered uncertain and indefinite, or what was rendered uncertain by the one was made unintelligible by the other. Whatever divers views may be entertained as ■ to the use of such words in contracts and other private writings and documents, there ought not to be much difficulty in condemning the use of them in pleadings, court proceedings, and legislative acts, all of · which, including judgments and decrees, require precision and certainty. In the July, 1932, issue of the American Bar Association Journal, the editors, in speaking of the use of "and/or," say:

"Mr. Justice O'Connor of the Appellate Court of Illinois (Preble v. Architectural, etc., Union, 260 Ill. App. 435) has recorded his timely protest against the increasing misuse of the labor-saving (?) symbol 'and/or.' He said: 'Before affirming the decree in this case we feel impelled to say that in the last few years the words "and/or" have with increasing frequency crept into legal documents, including pleadings and even instructions to the jury. * * * We must condemn the use of the words "and/or" because they tend to confuse and mislead. * * * In a close case where these words are used, a situation may be presented that would warrant this court in reversing a judgment or decree.' "

The journal further says:

"The use of this symbol arises in part from a doubt as to which of the two words should be used. Is it any solution of this doubt to leave the question to be solved by construction at a later time?

"We venture the assertion that any man who knows the meaning of the two words and the established distinctions in their use can take a modern contract or statute, bristling with this symbol, strike out every one of them and substitute the proper one of the two words, to the great clarification of the meaning of the instrument or act.

"In short, we believe the symbol to be a device for the encouragement of mental laziness even in the drafting of private contracts, but against its use in pleadings and court proceedings and in legislative acts or in either of the foregoing categories, we join in the protest of Mr. Justice O'Connor."

As quoted in the September issue of the journal, Mr. John W. Davis, of New York, said:

"Nothing has heartened me more of recent years than the leading editorial in your current issue of the conjunction 'and/or.' I expect to spend my declining years in a crusade against this pollution of the English language. It is a bastard sired by indolence (he by Ignorance) out of Dubiety. Against such let all honest men protest."

In the same issue Mr. George W. Wickersham, of New York, said:

"I read with interest your editorial in the July number of the American Bar Association Journal on the growing use of that barbarism 'and/or.' It is one of the worst examples of 'journalese,' and assuredly has no place in any composition written by one who has a knowledge of the English language. The primary requisite of any juridical language necessarily is exactness. If a writer means to use the conjunctive, he should employ the word 'and,' and if he means to express the disjunctive, he should use the word 'or,' but to use this expression 'and/or' is indicative of confused thought, which should have no place in either a statute or a legal document. The English language, derived as it is from different racial origins, at best lacks precision such as the Latin languages enjoy, and if we import into it such barbarisms as 'and/or,' we make confusion worse confounded. I agree entirely with the expression of your belief in the July Journal,

that the symbol is 'a device for the encouragement of mental laziness even in the drafting of private contracts,' while its use in pleadings and court proceedings and in legislative acts is utterly unjustified."

In the case of *State* v. *Dudley,* 159 La. 872, 106 So. 364, 365, the court, in referring to the expression "and/or," said that:

"When used in a contract, the intention is that the one word or the other may be taken accordingly as the one or the other will best effect the purpose of the parties as gathered from the contract taken as a whole. In other words such an expression in a contract amounts in effect to a direction to those charged with construing the contract to give it such interpretation as will best accord with the equity of the situation, and for that purpose to use either 'and' or 'or' and be *held down to neither,*"

and condemned the use of such words in legislative acts.

In the case of *Bobrow* v. *United States Casualty Company,* 231 App. Div. 91, 246 N. Y. S. 363, the court, while not condemning the use of the words "and/or" in an insurance policy, yet held that whatever ambiguity was created thereby was resolved, as ambiguities in such policies generally are resolved, against the insurer.

As has been seen by the petition or application filed with the commission, Putnam alone in his individual capacity was characterized as the employer, and judgment for compensation was demanded alone against him. He alone was served with process, and he alone as defendant appeared in the cause, the title of which was so designated in all documents and papers filed in the cause, until the commission made and filed findings and rendered a decision, and then, without any amendment as to parties or otherwise, the commission characterized the title of the cause, "John G. Chew, Applicant v. The City Waste Paper Company and/or L. A. Putnam, Defendants." By finding I, the commission found that the applicant was in the employ of the City Waste Paper Company; by finding II, that he sustained an injury "while

employed by the City Waste Paper Company and/or L. A. Putnam; by finding IV, that he was injured "while driving a team owned by the City Waste Paper Company and/or L. A. Putnam"; by finding VI, that the defendants attempted to show that "the contract was entered into between the City Waste Paper Company and/or L. A. Putnam" (when the contract shows it was entered into between the City Waste Paper Company, by L. A. Putnam, Manager, and F. D. Gray), and that it was entered into to "defeat this proceeding," etc. As conclusions of law, the commission again stated that the applicant was injured "while in the employ of the City Waste Paper Company and/or L. A. Putnam"; and that the "City Waste Paper Company and/or L. A. Putnam should be required to pay compensation" at a stated amount and medical and hospital expenses.

As already seen, for more than 7 years, and as shown by the undisputed record of the county clerk's office, Mrs. Putnam and her stepdaughter were the sole and only members of the company and owners and proprietors of the business. No claim is made that anything was subsequently filed or done to change such ownership. On the contrary, the evidence shows without dispute no such change was made. In making the finding that the business was "owned" by Putnam, the commission ignored or impeached the undisputed record in the county clerk's office, and evidently based such finding on testimony that Putnam hired, paid, and discharged workmen in the business, all of which was just as consistent with the fact that he was only the manager of the City Waste Paper Company as with the fact that he was the owner of the business. Whether the City Waste Paper Company be regarded in the nature of a partnership or merely as an assumed name of an association of persons carrying on business under such name, still, by the record on file in the county clerk's office and by the testimony of those possessing knowledge of the fact, it was shown Putnam was not a member of the company. The frequent use of the words "and/or" in the findings, conclusions, and

judgment implies that the City Waste Paper Company and Putnam were separate and distinct entities, and expresses a doubt and uncertainty as to who was the employer, whether it was Putnam or the company. The action being alone against Putnam in his individual and not in any assumed or fictitious name, if, on the evidence, the commission intended to find and adjudge that he was the employer, whether the business was carried on by him in his own or in a fictitious name, the findings and the judgment, if the evidence warranted, should have been against him alone and not against him "and/or" somebody else. But the record does not show, nor does the commission find, that Putnam carried on any business under a fictitious or assumed name. The record in such respect shows that the name used in carrying on the business was the name assumed by Mrs. Putnam and her stepdaughter and not by Putnam. If, on the other hand, it was intended to find and adjudge that the City Waste Paper Company was the employer, whether in the nature of a partnership or a mere association of persons doing business under such name, and an affidavit or certificate having been properly filed showing the members of the company and the claimed owners of the business, then the company or its members ought to have been made parties to the cause and given their day in court; and, if the evidence warranted, judgment should be rendered against them, and not against "and/or" somebody else.

We think the findings and judgment too uncertain to give effect to them. And, for that and other reasons stated, the award is annulled, and the cause remanded to the commission for further proceedings.

CHERRY, C. J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.