475 P.2d 1013

**STATE of Utah, Plaintiff and Respondent,**

v.

**Lanson Roy PRATT, Defendant and Appellant.**

No. 12061.

Supreme Court of Utah.

Oct. 22, 1970.

Henriod, J., concurred and filed opinion.

Ellett, J., dissented and filed opinion.

Crockett, C. J., dissented and filed opinion.

George B. Handy, Ogden, for defendant-appellant.

Vernon B. Romney, Atty. Gen., Lauren N. Beasley, David A. Goodwill, Asst. Attys. Gen., Salt Lake City, for plaintiff-respondent.

TUCKETT, Justice:

The defendant was charged in the Juvenile Court of Davis County with the of-

fense of contributing to the delinquency of one Nelda Pratt, the defendant's half sister, in that he caused Nelda to pose nude in a lewd and suggestive manner and taking photographic pictures at such time.

The defendant entered a plea of not guilty and a trial was had before the court sitting without a jury on the 28th day of January, 1970, March 18, and March 25, 1970.

The facts developed during the course of the trial were to the effect that on August 1, 1969, Nelda Pratt, then under the age of 18 years, was invited to the home of the defendant in Woods Cross by the defendant's wife, Lavonne Pratt. During the course of the evening Nelda had several drinks containing alcohol, and it was suggested by Lavonne that Nelda pose in the nude so that photographs could be taken. Photographs were taken by one Harold Zesiger who was also charged with an offense similar to the one we are here concerned with. Zesiger was called as a witness by the State and he testified that on August 1, 1969, he was at the home of the defendant and that he took certain photographs of Nelda, and that he was assisted by the defendant and the defendant's wife, Lavonne Pratt. The witness also testified that the picture taking occurred between the hours of 8:00 and 10:00 o'clock p. m. on the day in question.

The defendant testified that on the day in question, August 1, 1969, he reported to his place of employment in Salt Lake City at 4:00 o'clock in the afternoon and worked until 2:00 o'clock on the following morning. He further testified that he arrived at his home at approximately 2:20 a. m. and upon entering the living room he was handed a lamp by his wife; that when his wife turned on the lamp, he observed Nelda posing in the nude, whereupon he left the room. Defendant also testified that he later found the photographs at his residence and delivered them to the police. The superintendent at the defendant's place of employment and another employee at the plant corroborated the defendant's testimony as to his whereabouts on the evening of August 1st and the early morning hours of August 2d. The only other witness called by the State who testified as to the occurrences at the home of the defendant on August 1, 1969, was Nelda Pratt. The critical problem in the case as it now stands is whether or not the testimony of Nelda was sufficient corroboration of the testimony of Harold Zesiger, an accomplice. On the first day of the trial Nelda testified in part as follows:

Q. Did anyone assist Harold in taking the pictures?

A. Lavonne did.

Q. What did she do?

A. She held the light and she suggested poses and she put down the sheets and everything.

Q. I see. Did Roy participate in any regard?

A. Well, I'm not sure, really, but I think I saw some other man holding some lights that looked like Roy, but I'm not sure.

Later during the proceedings Nelda was recalled as a witness and testified as follows:

Q. Alright can you say with any certainty that Roy was present at the time these pictures were, at the time you were posing in this lewd, or in this lewd manner and these pictures were being taken?

A. No, because there was a light shining in my face and I couldn't see past the light.

Q. Alright, and when these pictures were taken did Roy cause you to pose in any way?

A. No.

Q. Did he take any pictures of you?

A. No he didn't.

Q. And as fare [sic] as you were [tape not clear] [sic] he was not even present during the time there was this picture taking?

A. As far as what I've said yes.

Q. Yes what, yes he was or?

A. Yes, he wasn't.

The testimony of Nelda taken as a whole is so self-contradictory, vague and uncertain [1] that it must be deemed wholly insufficient to corroborate the testimony of Zesiger and to connect defendant with any wrongdoing.[2] The only other testimony showing the defendant's presence at the scene is that of the defendant himself which is to the effect that he appeared upon the scene of Nelda's posing momentarily and that he left immediately. The defendant's presence at the scene of a wrongdoing is insufficient to show his guilt beyond a reasonable doubt.

The judgment of the court below is reversed and that court is directed to dismiss the complaint.

CALLISTER, Justice, concurs.

HENRIOD, Justice (concurring).

I concur in the main opinion and disagree with both of the dissents.

Mr. Justice Ellett's conclusion that the main opinion lays down a strange and novel rule of law by overturning the "verdict" of the trial judge sitting without a jury be-

---

1. Putnam v. Ind. Com., 80 Utah 187, 14 P.2d 973; Oberg v. Sanders, 111 Utah 507, 518, 184 P.2d 229; Edwards v. Clark, 96 Utah 121, 83 P.2d 1021; Alvarado v. Tucker, 2 Utah 2d 16, 268 P.2d 986.

2. Section 77–31–18, U.C.A.1953; State v. Vigil, 123 Utah 495, 260 P.2d 539; State v. Sinclair, 15 Utah 2d 162, 389 P.2d 465.

cause the testimony of the corroborating witness was "somewhat" contradictory, seems to be as strange and novel as the assertion itself. The testimony of the nude nemesis was not "somewhat" contradictory and as "deviate" as this erstwhile minor who gave it, who, at 17, short a few months from adulthood and emancipation, appeared almost to be an experienced lady of the pavements. It is axiomatic that a witness's testimony is no stronger than its weakest link on cross-examination, and that rule should apply here a fortiori, where the tortious, topsy-turvy testimony appears to have been adduced on direct examination.

I think the dissent confuses the rule as to weight and credibility of evidence in civil cases, where but a preponderance is required to arrive at a conclusion, and that in criminal matters, where the evidence must be clear and convincing, or, in other words, such as would require a reasonable prudent man to arrive at a finding of guilt beyond a reasonable doubt. This seems evident from the dissent's citations,—William v. Lloyd, a suit for damages in a civil personal injury action, and the C.J.S. reference having a similar connotation.

It is submitted that if we take all of the evidence stated in the dissent, selected out of context, and stated with considerable empathy for the lady with the amorous eccentricities, and apparently with implied revulsion for defendant, whose alibi was so much more worthy of belief than the peripatetics of the willing exhibitionist and the alleged defendant's accomplice who appeared to be nothing but a home breaker and a Polaroid panderer, and whose testimony appears to have been sold to the prosecution for immolated immunity, does not tend to show that the defendant committed the crime charged.

It is said in the dissent that "It was for the trial judge to decide what the facts were." This, as a principle, is well taken. But there is another principle that controls here: "It was for the trial judge to decide what the facts were, but not necessarily at the expense of double-talk, conjecture, bias or unreason." The dissent says the trial court "could believe a part of a witness's testimony to be true and disbelieve other parts if he chose to do so." This I believe, is not his province, absolute, or to be the law. If a complaining witness swears that the defendant was the culprit, and in the next breath says he was not, uttered in the light of and supplementary to the testimony of a sell-out accomplice, it is not the type of evidence that would justify anyone in concluding that the defendant was guilty beyond a reasonable doubt. If the arbiter of facts convicts on such erratic, self-serving evidence, I believe this court would violate the letter and spirit of the law if it condoned the hypothecation of a man's liberty on such low-level testimony. It is frightening to think that any court might convict, on the nebulous evidence adduced,

had the defendant been charged with murder, and had the flashlight flooding the flaccid form of the complainant concealed a deadly weapon rather than a ray of light, and the complainant had been killed. Were the principle espoused in the dissent to the effect that the trial court is the arbiter of the facts and we must accept those facts without question, the reason for this court's existence would disappear, and better we would be employed in some other profession.

Mr. Chief Justice Crockett pens an even more superficial brief of condemnation. He says it is agreed that there were goings on that were sordid; that there were two men present, one of whom was the defendant (who admitted he was present for a few minutes); that the star witness's testimony which was all mixed up had "a hollow ring, smacking of being defensive of her half brother." I challenge anyone to justify a conviction on that evidence, and submit that any suggestion of affirmance thereon has the same "hollow ring" to which the dissent attributes the peripatetics of the star witness mentioned. The rest of the dissent simply implies that, irrespective of the low-grade evidence, the "watering" down, the "hollow ring," the unusual turn of the testimony that clearly proved perjury at one time or another, the Chief Justice accepts it as proof beyond a reasonable doubt that the defendant was guilty of the crime

charged,—a conclusion this author cannot buy.

It is difficult to conclude that a man given a $50 fine would go to the expensive extreme of appealing this case if he were guilty.

The record in this case is about as flimsy as the evidence. Not only the evidence but even the tape recorder broke down.

ELLETT, Justice (dissenting).

I dissent. The decision as written lays down a strange and novel rule of law. It purports to overturn the verdict rendered by the judge sitting without a jury because the testimony of the corroborating witness was somewhat contradictory.

Until this day the law was to the effect that except in equity matters the trier of the facts could weigh the testimony of each witness and give such weight thereto as he deemed proper.[1] The law is set out in 5A C.J.S. Appeal and Error § 1645, where a host of cases is appended in the footnotes. Other cases may be found in West Publishing Company Digest, Appeal and Error, ⬳994.

The trial judge in this case heard the corroborating witness (a half sister of the defendant) testify that the defendant and the accomplice went for some "booze"; that she heard the defendant's voice in another room; that she saw a second man holding

1. Williams v. Lloyd, 16 Utah 2d 427, 403 P.2d 166 (1965).

the light and he looked like the defendant. When the State rested, the defendant asked for additional time to produce his evidence. During the interim he served notice that he intended to offer evidence as to an alibi and also changed lawyers. Twenty-three days later he put on his evidence. He called the victim, his half sister, as his own witness. At this hearing the witness was not too sure about the identity of the defendant. However, she admitted that she had told the investigating officer when he initially contacted her that the defendant was present. She also admitted telling the prosecuting attorney before trial that the defendant was present when the pictures were taken. She never changed her testimony to the effect that the only men present during the time in question were the defendant and the accomplice and that while the pictures were being taken by the accomplice the other man who looked like the defendant held the light.

The defendant testified in his own behalf and in doing so corroborated the accomplice. He admitted that he held the lamp but when he saw what was going on, he left the room and went to bed. He would have the court believe that he entered a dark room and took an ordinary reading lamp from his wife, and when she turned it on, he held it for about eight seconds, during which time he saw his 17-year-old half sister lying nude upon the floor in a most vulgar and suggestive pose and that he did nothing more than leave her there and go to bed. He testified that the reason he did nothing was because he was afraid of the violent temper of his accomplice. However, he had told the investigating officer prior thereto that he left the room and went to his bed because he was afraid his wife would shoot him.

The opinion states that the defendant testified that he worked from 4:00 p. m. August 1 to 2:00 a. m. August 2, but it does not tell you that the evidence presented by the defendant also had him back at work at 6:28 a. m. on August 2, the same morning that he said he came home.

The defendant claims that he knew nothing about any pictures being taken but the next day found four of the nude pictures on the refrigerator. These pictures he kept until, as he says, " * * * they'd just thrown me out and everything and they wouldn't give me any of my work clothes or anything, so I eventually had to get them and I figured while I was in there I might as well get rid of them pictures so I give 'em to Steve [the officer] * *"

It was for the trial judge to decide what the facts were. He could believe a part of a witness's testimony to be true and disbelieve other parts if he chose to do so. It certainly is not for this court to tell him that he cannot believe the witness told the truth on January 28 simply because she changed some of her testimony three weeks later.

The judge as the trier of the fact could consider her reasons for changing her testimony. Was it a desire to protect her half brother? One may wonder just why the change, but it was within the sole province of the trial judge to determine what the facts were.

I would affirm the judgment.

CROCKETT, Chief Justice (dissenting).

I concur in the dissenting opinion of Justice Ellett and make these further observations: From the evidence it is indisputable (and no one does dispute) that the goings on that night in that house with respect to the juvenile were lewd and sordid. Further, it is likewise incontestable, and the only evidence is, that there were *only two men present:* the one was Harold Zesiger, who took the pictures; the other one could not have been anyone other than the defendant. This was at first affirmed by the victim. Her story, told at a later time, in which she said that because the lights were in her face she could not see, but the voice sounded like Roy's (the defendant) has a hollow ring, smacking of being defensive of her half brother.

It was undoubtedly obvious to the trial judge that the case had to be presented through uncooperative witnesses; and that the subsequent developments in the "watering-down" of the victim's testimony, and also the evidence of alibi, presented at a much later time, and through the associates of the defendant, are things which are neither unusual nor unexpected to experienced triers of the fact. The trial judge saw this whole situation in perspective and made the determination. The majority opinion is but a disagreement with the trial court on questions of fact, which it was the prerogative of that court to determine. There is in my mind no doubt that established rules of appellate review properly applied would require us to affirm the judgment.