389 P.2d 465

The STATE of Utah, Plaintiff and Respondent,

v.

Jean SINCLAIR, Defendant and Appellant.

No. 9971.

Supreme Court of Utah.

Feb. 18, 1964.

Henriod, C. J., dissented.

See also 15 Utah 2d 27, 386 P.2d 726.

Sumner J. Hatch, Salt Lake City, for appellant.

A. Pratt Kesler, Atty. Gen., Ronald N. Boyce, Deputy Atty. Gen., Salt Lake City, for respondent.

CROCKETT, Justice:

Jean Sinclair was convicted of murder in the first degree of Don L. Foster and upon the jury's recommendation of leniency, was sentenced to life imprisonment.[1]

1. Sec. 76–30–4, U.C.A.1953, provides for the death penalty unless the jury recommends leniency.

**164**

Sixteen points are made attacking the conviction, including: insufficiency of the evidence to justify the verdict; errors in instructing the jury; in rulings on evidence; and improprieties occurring during the trial.

 On appeal it is our duty to accept the facts as the jury could have believed them upon a survey of the evidence, and whatever inferences could fairly be drawn therefrom, in the light most favorable to the verdict.[2]

On January 5, 1963, in the very early morning, about 12:30 a. m., the deceased, Don L. Foster, and his woman companion, LaRae Peterson, returned from a movie and drove to the parking lot in the rear of the Susan Kay Arms apartments, between 5th and 6th North on 2nd West in Salt Lake City, where Foster lived. He got out on the driver's side, turned and reached to the rear seat for his overcoat, when he was shot and killed by a short-range shotgun blast in the neck and face.

In searching for a solution to this crime the police learned from LaRae Peterson that the defendant Jean Sinclair had manifest an animus toward Foster. Their investigation revealed this further evidence: that Jean Sinclair was a single woman of about 45 years of age, who operated a nursing home in Salt Lake City; that she appeared to be perverted toward the masculine side; affected masculine character and appearance and wore mannish-type clothes; that she was a strong-willed individual, who "usually got her way"; and was called "King" by her associates. There was a basis for believing that she had an unnatural relationship with this LaRae Peterson for whom she had an inordinate attachment and concern; that she was therefore extremely jealous of Don L. Foster, a married man, who was carrying on an illicit affair with LaRae Peterson; and that she harbored a violent resentment toward him. She talked of this to her associates and proposed various ways of compelling Foster to leave LaRae Peterson alone. These included a plan to drug her, strip her and put on "the Lesbian act" in a situation where Foster could see it, which she figured might break up his affair with her. She also made proposals to two of her associates, Vaughn Humphries and Karl Kuehne, on separate occasions, that the three of them disguise themselves as "Danites" [3] and catch Foster and castrate him; or that they should put a knife blade to his privates and threaten castration to scare him into keeping away from LaRae Peterson.

2. State v. Ward, 10 Utah 2d 34, 347 P.2d 865.
3. According to folk tradition, a group of early Utahns pledged together to use violent means to destroy their enemies. See Webster's New International Dictionary, Third Edition.

In the fall of 1962 in talking to Kuehne, defendant used violent language about Foster, culminating with, "I think the son-of-a bitch ought to be killed." Later she told Kuehne that she was "serious about killing this guy" and asked him if he would like to make a fast $500; she also made several other proposals to Kuehne about killing Foster, which he refused. After his continued refusal she finally told him that even if he didn't want to kill Foster they could still be friends; and that if he wouldn't kill Foster, she would. They drove together around to look over several places where Foster was likely to be at certain times and which would thus present a good opportunity for Sinclair to carry out her plan to kill him.

On or about December 28, 1962, using the pretext that she wanted a shotgun to shoot some pheasants on the farm at Sandy, defendant got Kuehne to buy her a 12-gauge shotgun and some shells. On January 4, 1963, the evening before the crime, Sinclair brought the shotgun to Kuehne's home and asked him to saw off the barrel, which he did. She left his home with the gun and shells about 11 p. m. She was dressed in gray men's pants, had on boots, and had a tan trench coat wrapped around the gun.

At about 1:00 a. m., January 5, (which would be about one-half hour after Foster was killed) the defendant returned to Kuehne's home with the shotgun. In their conversation she stated, "Well, I killed the son-of-a bitch." As to LaRae Peterson, she stated that she was there and that "she just screamed on." She also told Kuehne that there were so many cars in the area that she had to crawl around several of them to get in a position to shoot Foster. Kuehne said that he recalled that her trench coat was "smudged with a bit of grease and dirt." She told Kuehne that he was an accessory, both before and after the fact, and twice warned him that he had better get rid of the gun. The next day Kuehne took the gun and shells up a nearby canyon and threw them away. At the time the officers were investigating, it had snowed and they were unable to find the gun and shells from Kuehne's description. But some days thereafter, after the snow had melted, they were found under his direction.

Although there can be no question but that the evidence of this crime as recited above is sufficient to sustain the conviction of first degree murder, defendant attacks it upon the ground: that the crime as thus delineated is based to a very large extent upon the testimony of Karl Kuehne; that if it was committed in the manner the State contends, he must be an accomplice; and that there is no evidence independent of his testimony connecting her with the crime. Whether Kuehne was in fact an accomplice was a question for the jury, as will be seen below, but for the purpose of treating this contention, we assume that Kuehne was an accomplice.

We recognize that an accomplice may be motivated to falsify because of a desire to blame someone else in connection with the crime; or in the hope of obtaining leniency; or the very fact that he is involved in crime may tend to impair his credibility. These combine to justify looking upon his testimony with caution and refusing to permit a conviction to rest upon his word alone, as our statute provides.[4] We are also aware of the refinements of the rule that the corroborative evidence is not sufficient if it only shows that a crime has been committed, or the circumstances thereof, or that the accused had a motive to commit it.[5] However, even though no one of these alone would be sufficient, they are each relevant and material and may all be considered together in determining whether the test of corroboration is met: is there evidence, independent of the testimony of the accomplice, which the jury could reasonably believe tends to implicate and connect the defendant with the commission of the crime.[6]

There is evidence from witnesses other than Kuehne bearing out the facts concerning defendant's unnatural relationship with LaRae Peterson; that she had such an impassioned attachment to her and resentment of Foster that she wanted to resort to fiendish violence to get rid of his rivalry for her favors.[7] In addition to these facts and that defendant was known to associate with Kuehne, there are certain other facts also shown by independent evidence, which we have deferred reciting until the treatment of this contention. These are: that the defendant made a statement in the presence of Kuehne's wife that if he wanted to make some money fast, it would take only a few seconds (which tends to corroborate Kuehne's story of the offers of money to kill Foster); that she was seen driving around in a car with him; that on the afternoon of January 4 she had learned in a telephone conversation with LaRae Peterson that the latter would be out with Foster that evening; and that she knew enough about their association to have reason to believe that that they would be returning to Foster's apartment, which would provide her with the opportunity she had been seeking.

A witness, LaMar B. Williams, who was at the Susan Kay Arms apartments testified that shortly after midnight he

---

4. Sec. 77-31-18, U.C.A.1953.
5. Ibid; and see State v. Somers, 97 Utah 132, 90 P.2d 273 (motive alone insufficient corroboration); State v. Vigil, 123 Utah 495, 260 P.2d 539 (mere suspicion insufficient corroboration).
6. See State v. Clark, 3 Utah 2d 382, 284 P.2d 700 and cases there cited.

7. That motive is a factor which may be considered in connection with other evidence as tending to connect accused with the crime. See State v. Somers, footnote 5 above; 23 C.J.S. Criminal Law § 812 (4).

observed a person, whom he described as resembling Jean Sinclair, and dressed in clothes similar to those she was wearing, in the parking area near where Foster was killed, just a few minutes before it happened. (This the jury could have accepted as placing the defendant at the scene of the crime very close to the time it was committed.) [8]

Another witness, Boyd K. Harvey, who was driving by at the time heard a shot and saw a person, dressed similar to the way defendant was (with a trench coat on) run from the apartment into 5th North Street carrying an object extending 18 to 24 inches above the right hand (which could well have been the sawed-off shotgun), and get into a two-toned car which drove away. (The defendant owned a car of this general description.)

Two neighbors, a Mr. and Mrs. Pieter Combee, who reside immediately west of the Susan Kay Arms apartments, just after the shooting heard the woman, LaRae Peterson, cry out, "Oh God, *she* killed him."

It was shown that the morning after the killing the defendant took a three-quarter length trench coat and some slacks, similar to the clothes she was wearing that night, which had grease spots and dirt on them, to a cleaners. (This connects up with the fact that the defendant had to crawl around cars, and that there was grease and dirt on her clothing.)

There is another fact which may be regarded as inculpatory: that upon questioning, the defendant denied ever having been at the Susan Kay Arms apartments, yet the witness, Gerritadina Combee, testified that some few days earlier, about Christmas time, she had seen Jean Sinclair, dressed in men's clothes, at those apartments in about the same area as the killing.

■ It may well be that certain of the foregoing facets of the evidence, considered separately, could be regarded as not inculpatory and thus be vulnerable to defendant's charge that it does not connect her with the crime. But that is neither the sensible nor the practical approach to the problem. Nor does the law require that the separate bits of evidence be viewed in isolation. A great many crimes are planned to be committed by stealth and in secret, as this one was. It is necessary and proper to take whatever fragments of proof can be found and piece them together in conjunction with the reasonable inferences to be drawn therefrom in order to fill in the whole mosaic of the crime. We are cognizant that our statute uses the language "without the aid of the testimony of the accomplice" and that it has been said that the corroborative evidence should be looked

8. That presence of the defendant at or near the time and place of crime, together with motive, may be regarded as corroborative evidence, see State v. Jones, 95 Mont. 317, 26 P.2d 341; and Warren, Homicide, Sec. 274.

at separate and apart from his testimony.[9] That is true to determine whether there is *some* independent evidence which tends to connect the defendant with the crime. But it is also true that the evidence can only have relevancy to the crime as it relates to the circumstances surrounding it.

■ Conceding the wisdom and propriety of being wary of the testimony of an accomplice, and of not permitting a conviction to rest solely upon it, nevertheless, reason dictates that the practical exigencies of a situation may well require that all of the circumstances be viewed together in order to determine the facts. For example: witnesses see X coming from the woods. He has a knife and is smeared with blood. Considered alone, this could well be innocent. He may have killed a deer. But the body of a man, recently killed by stabbing, is found nearby. An accomplice to the murder states that he and X did it. It is obvious that the observations that were made of X near the time and place of the murder, considered in the light of the later-discovered facts, take on a different significance and could reasonably be regarded as tending to connect X with the crime. The same reasoning applies to the instant case. The corroborative evidence should be considered in relation to the other facts shown.

When this is done it seems undoubted that it could be accepted by reasonable minds as evidence of substance and probative value tending to connect the defendant with this crime. This satisfies the requirement of the law.[10]

■ Defendant urges errors in connection with the charge to the jury which devolve upon refusal to instruct as a matter of law that Kuehne was an accomplice. This could properly have been done only if that fact had been established without dispute. Two factors combine as an obstacle to doing so here. One is that the defendant herself as a witness denied the facts which would have made Kuehne an accomplice to the crime. The other is that in his own testimony Kuehne protested his innocence of any participation in it. He claimed that he refused to be involved in killing Foster, even though offered substantial money; that he tried to talk the defendant out of her resolve to kill him; that he got the gun for her only on her pretext that she wanted it to shoot pheasants; and that he sawed it off and advised her that it was then illegal to possess it with the thought that this would force her to get rid of the gun and abandon the idea of killing Foster. Whether those explanations are credible, or are merely flimsy excuses, was for the jury to

9. See State v. Clark, footnote 6 above; State v. Vigil, footnote 5 above; and State v. Erwin, 101 Utah 365, 120 P.2d 285.

10. See cases cited in footnote 5, supra.

determine. But in view of the fact that the testimony of both the defendant and Kuehne dispute that he was an accomplice, the court would have been invading the province of the jury of judging the credibility of the witnesses and finding the facts if it had presumed to tell them that Kuehne was an accomplice.[11]

Another difficulty with instructing the jury that Kuehne was an accomplice, where there was dispute about the matter, is that doing so may well have conveyed to the jury the idea that the court believed at least those aspects of his story which involved him in the commission of the crime; and if the court credited that much of his testimony, this credit may well have carried over to those aspects of his version of the crime relating to the defendant's involvement. From the foregoing considerations, it appears to us that the trial court was well advised in deciding not to instruct that Kuehne was an accomplice, but properly left the matter to the jury, telling them that if they believed he was an accomplice, his testimony must be corroborated under the rule hereinabove discussed, before they could convict the defendant.

█ The defendant charges prejudicial error in sustaining an objection to a question asked of a deputy county attorney:

"Why didn't you have a complaint filed against Mr. Kuehne, Mr. Dibblee?"

It is important to keep in mind that in determining whether filing such a charge would be justified, it would be necessary to consider the evidence, excluding Kuehne's testimony, but including his story as given to the police, in both of which he insisted upon his innocence. In doing so it is readily seen that there is a problem as to whether the evidence here disclosed would have justified filing such a charge. Therefore the question propounded would involve consideration of the legal reasoning of the attorney; and perhaps the tactics to be employed in handling the prosecution for this murder. Ordinarily whether someone else has been charged with the instant offense is indeed immaterial to the issue as to the guilt or innocence of the defendant who is on trial. The issue of concern here was not Kuehne's guilt or innocence but the defendant's. It is also to be noted that defense counsel did not disclose to the court the purpose of the question, nor make any offer of proof concerning the matter. Nor did he ask the witness whether a promise of immunity from prosecution had been made to Kuehne. We do not think that the court committed error prejudicial to the defendant in sustaining the objection to the question as to why this deputy county attor-

11. That to instruct that something is true which is in dispute is error, see State v. Fertig, 120 Utah 224, 233 P.2d 347.

ney had not instituted a prosecution against the witness Kuehne.

We have considered and find without merit various other claimed errors in rulings on evidence; and also a number of alleged improprieties in the conduct of the attorneys, witnesses, jurors and spectators talking to each other, exchanging greetings, shaking hands, and a spectator soliciting autographs. Considering the fact that this trial attracted a great deal of public attention, and that it lasted for about three weeks, it would be strange indeed if some incidents short of perfect decorum had not occurred, particularly short of what defense counsel now demands. It is agreed that some of the conduct complained of may not have been exemplary, and that those involved in an official capacity in the trial should avoid any familiarity beyond discreet and reserved civility with the parties, witnesses and jurors.

Under our statute, which requires that errors which do not affect the essential rights of the parties be disregarded,[12] we could not properly interfere with the jury's verdict unless upon a review of the whole case it should appear that there was error of sufficient gravity that the defendant's rights were prejudiced in some substantial way.[13] We have found nothing of any such consequence here.

Affirmed. No costs awarded.

12. Sec. 77-42-1, U.C.A.1953.

McDONOUGH, CALLISTER and WADE, JJ., concur.

HENRIOD, Chief Justice (dissenting):

I hesitate in sharing the jury's verdict that the evidence pointed to the result it reached *beyond any reasonable doubt,* and this hesitation is impelled by the quantum and quality of some of the evidence adduced, a lot of which seemed to have been of an unsavory complexion. Because of this hesitancy I feel constrained to think that in resolving doubts in favor of an accused, as we must, this case merits another hearing, hence I dissent. In so doing, I would point out only a portion of the voluminous testimony adduced, as illustrative of the quality of the evidence, or lack of it, of such unusual atmosphere as to have created in my mind the hesitation of which I speak.

I am of the opinion that without the testimony of the State's "star" witness, there would have been insufficient evidence to justify a conviction *beyond all reasonable doubt.* If this witness' testimony were expunged, I think this court could not affirm the verdict, and so far as I am concerned, the fantasy indulged by the witness leads me to believe his entire testimony should have been the subject of disbelief, except that which attested to his name, rank and serial number,—the last of which was

13. See State v. Siddoway, 61 Utah 189, 211 P. 968.

his number as an exconvict. The witness had been an auto companion of the accused more than once, the purpose of which seems to have been accentuated by silence concerning it. He clearly was an accessory before, after and between the fact. His novel narrative on the witness stand spun at best a story pointing to the possibility of his own complicity or principalship.

He told of the defendant offering him money to adjust the victim's status in the community to number him among those less fortunate than we. Significantly he declined the ignoble suggestion, thus reflecting lack of unlawful intentions. Thereafter, he testified, the accused asked him to buy her a shotgun, which he unlawfully did by the use of an alias,—apparently in Beelzibubian retreat from his erstwhile honorable intentions. Further, he said, the accused asked him to saw the lethal weapon in two, which he obligingly did. His explanation was that if he did this and told the defendant it would be unlawful for her to have it in her possession, this sage admonition would deter her from committing an intended mayhem. He allegedly said this but he also sawed as requested.

His previous felonious brush with the blue uniform, his unlawful purchase of the gun, his willing delivery of it to the accused, who, he hoped, would mothball it after his counsel given her, and his later friendly disposal not only of the weapon, but his beard, to this writer connotes a fantasy about as unbelievable and weird as a commentary by Alice, in Wonderland, in appraising the Wizard of Oz.

Shaving off the beard did not dismay the witness, when, once the bloodhounds picked up the scent, he obligingly and cleanshavenly led the peace officers to a grave in a nearby canyon, where apparently he thought the gun permanently had been interred, with appropriate rites,—overlooking the possibility of exhumation.

Someone asked him why he shaved off his beard. The convenient reply was that being under suspicion as a lively suspect himself, the hair would expose him to detection. Its removal, he conceded, was to provide a sartorial disguise and an insurance policy against apprehension,—a novel departure from the characteristics of the reasonable, prudent man and the ordinary cinema version of the cloak and dagger routine.

The above is a *sample* of some of the testimony and evidence, that is matched by other evidence of similar quality, all of which, in the aggregate, adds to my hesitancy in believing that the rule in this and other cases that one must be convicted beyond all reasonable doubt, was properly applied here, since I am convinced that without the testimony of the "star" witness mentioned above, the jury hardly could have arrived at the verdict.

So, the flag of fantasy unfurled by this witness, without which the shotgun may never have been found, its origin explained, or the accused convicted, I simply wonder whether or not a new hearing should be afforded, and resolve such doubt in favor of an accused person. It must have been that the jury gave credence to such tissue paper evidence, in my opinion, else, in my opinion also, there could not have been any raiment woven to produce any strong, spotless, untorn cloth of conviction, all of which, as I stated, makes me wonder,—thus this dissent.