434 P.2d 305

Jean SINCLAIR, Plaintiff and Appellant,

v.

John W. TURNER, Warden, Utah State Prison, Defendant and Respondent.

No. 10768.

Supreme Court of Utah.

Nov. 28, 1967.

Jimi Mitsunaga, Legal Defender, Salt Lake City, for appellant.

Phil L. Hansen, Atty. Gen., Warren M. Weggeland, Asst. Atty. Gen., Salt Lake City, for respondent.

CROCKETT, Chief Justice:

Jean Sinclair was sentenced in May of 1963 to imprisonment for life in the Utah State Prison for first degree murder. Her conviction was affirmed by this court in February, 1964.[1] In June of 1966, she petitioned the district court for release in a habeas corpus proceeding, contending that the publicity about her case had deprived her of a fair trial. After a plenary hearing and the taking of evidence, the trial court found the issues against her and dismissed her petition. She appeals.

In addition to the fact that practically any murder case attracts a great deal of public attention, this one presented some unusually bizarre facts, involving what may be termed an inverted love triangle. The plaintiff was convicted of killing a young man by the name of Don Foster in an apartment house parking lot in Salt Lake City. It appears to have been motivated by jealousy because she and the victim were vying for the affections of another *woman*.[2] As might have been expected, when this crime was discovered, there was a great deal of publicity about it, the search for its perpetrator, and subsequent occurrences

---

1. State v. Sinclair, 15 Utah 2d 162, 389 P.2d 465.

2. For more complete statement of facts see State v. Sinclair, footnote 1 above.

concerning the arrest, trial and conviction of the plaintiff. But it does not appear that this publicizing was any different than in similar cases since time immemorial. And under our system of freedom of expression,[3] it is difficult to see how it would be possible to prevent considerable publicity about such a case, or how law enforcement and the administration of justice could function if the mere fact of such publicity would vitiate them.

Underlying the issue here confronted: whether publicity prevented the plaintiff from having a fair trial, is the age-old and ever-present conflict between the rights of the individual on the one hand, and the rights of society on the other. Derived from the experience of centuries in combating tyrannical practices of those in power, there has been carefully built into our law numerous safeguards of the rights of individuals, and particularly of persons under accusation of crime. It is entirely appropriate that these rights are assured, and that great care has been taken to preserve them. But it seems to the writer that some members of the legal profession, and even some courts, at times become so obsessed with championing the cause of persons suspected of crime they lose sight of the real objective, which is to seek out the truth and do justice in an evenhanded way. It is just as important to keep in mind that the fundamental purpose of law is to protect the public from crime by having the guilty caught and convicted as it is to guard against convicting the innocent by protecting the rights of individuals accused of crime. The ideal we aspire to is to find and keep the middle course and to avoid the evils which result from veering too far to either side. As stated by Justice Cardozo: "[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained * * *. We are to keep the balance true." [4]

There is another aspect of the public interest which must be kept in mind in connection with this problem: the freedom of speech and of the press, and its corollary, the right of the people to know what is going on in the world, particularly in their public institutions, and especially in their courts. If information about matters of such public concern were suppressed so that investigations and prosecutions for crime could be carried on in secret, we would be in danger of reverting to the dread and fear of the Star Chamber.[5]

We acknowledge our awareness and concern over the fact that publicity, and es-

3. See U. S. Constitution, Amendment 1; Utah Constitution Article I, §§ 1 and 15, U.C.A.1953.

4. Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674.

5. See 4 Blackstone's Commentaries 266–68; 5 Holdsworth's History of English Law, 178–84.

pecially its abuses which are sometimes indulged in, can make the proper carrying out of the processes of law enforcement and the administration of justice extremely difficult if not impossible. For example, if there is an assumed conclusion of guilt, and this is implemented by the reporting of half-truths, or the coloring of evidence, it can have the effect of trying and convicting the accused in the eyes of the public. Such a course is self-defeating. It not only redounds to the prejudice of the accused in a number of ways, perhaps the most important of which is to make it difficult to obtain a fair and impartial jury, but it also has the ultimate effect of prejudicing the public by preventing the processes of law enforcement from functioning properly.[6]

We appreciate that the facts of life must be taken into account. The public is intrigued by the sensational, and thus by crime and the facts surrounding it. Consequently, it is but natural and perhaps necessary that the information media cater to that appetite. Yet this should also be considered: the service they perform so vitally affects the public welfare that in consideration of the guarantees of freedom of expression the law assures to them, they should be regarded as having corresponding responsibility to perform their duties in an awareness that in our system, they and the public whom they serve, all have an essential interest in, and in a sense are all involved in law enforcement. There should be a minimizing of sensationalism by the exercise of reasonable restraint and good judgment in reporting the news in as fair and objective a manner as possible, in an awareness of the desirability and indeed of the necessity of according those suspected or accused of crime fair treatment and a trial by an impartial court and jury.[7]

6. Cf. recent decisions of the United States Supreme Court in two celebrated cases, Estes v. State of Texas, 381 U.S. 532, 14 L.Ed.2d 543, 85 S.Ct. 1628 (1965); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); which overturned convictions on the ground that prejudicial publicity had prevented a fair trial. It seems undoubted that the instant proceeding was prompted by those decisions. In each of those cases, which attracted nation-wide interest and publicity, there was a significantly different situation than in the instant case. In the Estes case there was a radical departure from the dignity and decorum proper to maintain in a courtroom, the main aspect of which was making a public drama of the trial by permitting televising and broadcasting during the trial. In the Sheppard case it was also shown that there was somewhat of a carnival atmosphere in the trial; the court apparently let the situation get out of control; and because of the crowding in the courtroom and lack of control by the judge, together with the fact that there was unfair and prejudicial publicity in which it appeared that some of the press were "out to get" Sheppard, it was concluded that he had been deprived of a fair trial.

7. See What Constitutes Prejudicial Publicity in Pending Cases, A.B.A. Journal, October, 1965; Report of proceedings of conference on Free Press—Fair Trial, Northwestern University School of Law (1964).

From our examination of the evidence in this proceeding we can see no basis upon which it reasonably could be concluded that there was any such transgression of the principles discussed above that the plaintiff did not have a fair trial. The proof adduced was devoted almost entirely to establish simply that there had been a great deal of publicity about her case. Such effort as was made to show a likelihood that this fact, and that rumors concerning unsavory aspects of the relationship of the parties involved had the effect of prejudicing the jury, not only failed to so prove, but the evidence demonstrated to the contrary, and that the plaintiff's trial was significantly different from the cases upon which she relies and which undoubtedly prompted this proceeding.[8] As we noted in our prior decision, due to the nature of that trial, which lasted three weeks, "it would be strange indeed if some incidents short of perfect decorum had not occurred".[9] Some allowance must be made for the practical exigencies of life and human imperfections. Memory brings back from some source now unknown to me, "In the absence of angels, mortals must carry on."

We think the record here fully supports the trial court's findings rejecting the plaintiff's contentions and sustains his view that in the original trial ample precautions were taken to insure that the plaintiff had what she was entitled to: a fair trial by an impartial jury.[10]

While we have examined and disposed of the plaintiff's contentions on their merits, there is another difficulty in the position she essays here which should be noted. Substantially the same matters she now complains of were raised and ruled upon in the original appeal from her conviction, as will be seen by referring to that decision.[11] We took occasion to explain in the recent case of Bryant v. Turner, that it is not a proper purpose of a habeas corpus proceeding to provide another review of the same issues that have been previously adjudicated on a regular appeal.[12]

For the reasons set forth herein, the action of the trial court in denying the plaintiff's release is affirmed. No costs awarded.

8. See the cases of Estes and Sheppard, footnote 6 above.
9. State v. Sinclair, footnote 1 above, 15 Utah 2d 162, at p. 170, 389 P.2d 465 at page 470.
10. That the mere fact jurors may have become aware of purported facts through publicity or other sources does not disqualify them if they swear impartiality, see United States ex rel. Darcy v. Handy, 351 U.S. 454, 76 S.Ct. 965, 100 L.Ed. 1331 (1956); Latham v. Crouse, 320 F. 2d 120 (10th Cir. 1963.) See also Annotation Pretrial Publicity-Fair Trial, 10 L.Ed.2d 1243, § 4 (c), p. 1255.
11. Footnotes 1 and 9 above.
12. Bryant v. Turner, 19 Utah 2d 284, 431 P.2d 121.

CALLISTER and R. L. TUCKETT, JJ., and BRYANT H. CROFT, District Judge, concur.

HENRIOD, J., having disqualified himself, did not participate herein.

ELLETT, J., being disqualified, did not participate herein.