Jean SINCLAIR, Plaintiff-Appellant,

v.

John W. TURNER, Warden, Utah State Prison, Defendant-Appellee.

No. 71–1047.

United States Court of Appeals, Tenth Circuit.

Sept. 10, 1971.

Rehearing Denied Oct. 13, 1971.

James M. Gansinger, Denver, Colo., for plaintiff-appellant.

David S. Young, Asst. Atty. Gen., Salt Lake City, Utah (Vernon B. Romney, Atty. Gen., and Lauren N. Beasley, Chief Asst. Atty. Gen., on the brief), for defendant-appellee.

Before BREITENSTEIN, McWILLIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Jean Sinclair was convicted following a sixteen-day State jury trial in the District Court of Salt Lake City, Utah, of

the crime of first degree murder of one Don LeRoy Foster. Following a jury recommendation for leniency the Court sentenced Sinclair to life imprisonment. Her conviction was affirmed by the Utah Supreme Court. State v. Sinclair, 15 Utah 2d 162, 389 P.2d 465 (1964). In June, 1966, Sinclair filed a habeas corpus application with the same trial court. An evidentiary hearing was held and the application denied. She appealed that denial to the Utah Supreme Court, which affirmed the lower court. Sinclair v. Turner, 20 Utah 2d 126, 434 P.2d 305 (1967). The parties here agree that when Sinclair filed her application with the Federal District Court below she had exhausted her available state remedies.

██ Sinclair appeals here from the order of the United States District Court denying her application for writ of habeas corpus. At pre-trial it was stipulated that one of the petitioner's claims for determination was that "under the totality of circumstances" Sinclair was deprived of her right to a fair trial secured by the 6th and 14th Amendments to the Constitution of the United States. The court below took judicial notice of all State Court records and proceedings. An evidentiary hearing was not held. The Court denied relief finding "that under all of the facts and circumstances surrounding her trial that the petitioner was not deprived of the right to a fair trial as secured by the 6th and 14th Amendments to the Constitution of the United States, or at all * * *". In light of that finding this court will consider each of the appellant's contentions as if they had been specifically argued and rejected by the court below. The

court determined that Sinclair had received a full and fair evidentiary hearing in the Utah State Courts, both at the time of original trial and in collateral post-conviction and habeas proceedings. Townsend v. Sain, 372 U.S. 293, 83 S. Ct. 745, 9 L.Ed.2d 770 (1963). The Court found, by independent examination, that the State Court proceedings were presumptively correct, citing 28 U.S.C. § 2254(d). The writ was denied August 23, 1970. This appeal is from that order.

The United States Supreme Court in Townsend v. Sain, *supra*, held that the Federal District Court has the power to receive evidence and try the facts anew on a habeas corpus petition and must do so "where the facts are in dispute * * * if the habeas applicant did not receive a full and fair evidentiary hearing in the State Court, either at the time of trial or in a collateral proceeding," and that the court is not limited to a study of the undisputed portions of the State court records.

In lieu of application of the appellate review rule holding that the evidence must be viewed in the light most favorable to the government in order to determine if the evidence, direct and circumstantial, coupled with all reasonable inferences to be drawn therefrom, is substantial in justification of the jury verdict of guilt beyond a reasonable doubt, [Lewis v. United States, 420 F.2d 1089 (10th Cir. 1970); Mares v. United States, 409 F.2d 1083 (10th Cir. 1968), cert. denied 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564 (1969)], we proceed in accordance with the pertinent provisions of 28 U.S.C.A. § 2254(d).[1]

---

1. 28 U.S.C.A. § 2254(d) : In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

And in an evidentiary hearing in the proceeding in the Federal court, when due

■ Federal habeas corpus does not serve as an additional appeal from State court conviction. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). Sufficiency of evidence to support a State conviction raises no Federal constitutional question, and cannot be considered in Federal habeas proceedings by State prisoners. Linebarger v. State of Oklahoma, 404 F.2d 1092 (10th Cir. 1968), cert. denied 394 U.S. 938, 89 S.Ct. 1218, 22 L.Ed.2d 470 (1969); Williams v. Wainwright, 414 F.2d 806 (5th Cir. 1969). The guilt or innocence of an accused person when determined by a State court is not subject to review by Federal courts in habeas corpus proceedings. A State prisoner is entitled to relief in Federal courts only when rights guaranteed by the United States Constitution have been denied him. Opie v. Meacham, 419 F.2d 465 (10th Cir. 1969), cert. denied 399 U.S. 927, 90 S.Ct. 2239, 26 L.Ed.2d 793 (1970); Wagenknecht v. Crouse, 344 F.2d 920 (10th Cir. 1965).

We have reviewed all of the records, including the original State trial record. Any reference herein to those records is, under the rules above referred to, limited to contentions presented by appellant Sinclair alleging that her rights guaranteed by the Constitution of the United States have been denied. Mathis v. People of State of Colorado, 425 F.2d 1165 (10th Cir. 1970).

## I.

■ Sinclair contends that the lower court erred in its ruling that she had not been denied her rights guaranteed by the 6th and 14th Amendments and the due process clause of the Constitution of the United States by reason of the State trial court's limitation on cross-examination of the State's principal witness, Carl Kuehne, thus preventing Sinclair from attacking Kuehne's credibility in violation of an accused's right to confrontation of witnesses against her.

The prosecutor, soon after calling Kuehne as a State witness, fully developed that Kuehne had been convicted and confined in the Utah State Penitentiary following a 1952 felony charge of assault with a deadly weapon; that Kuehne had escaped from the penitentiary, gave himself up and was returned to the penitentiary; that he was released in December of 1959. Kuehne had been attending the University of Utah since his release, and at the time of trial in February of 1963 was a senior majoring in mathematics. The State made no attempt to conceal Kuehne's felony record or otherwise deprive the jury of knowledge concerning his felony conviction. It presented his record so that, in effect, his credibility was at issue at the outset. United States v. Perea, 413 F. 2d 65 (10th Cir. 1969), cert. denied 397 U.S. 945, 90 S.Ct. 960, 25 L.Ed.2d 125 (1970).

Sinclair contends that the trial court committed prejudicial error in curtailing cross-examination of Kuehne with respect to his felony conviction. On cross-examination Kuehne was asked what he had been convicted of. When he responded that he had been convicted of assault with a deadly weapon, he was asked, "What was the weapon?" The objection lodged to this question by the prosecutor was sustained. Sinclair cites a number of decisions holding that the right of a defendant to engage in extensive cross-examination is an essential requirement for a fair trial. None of these decisions, however, relate specifically to the scope and extent of cross-examination with reference to prior convictions. In

proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

effect, Sinclair contends that the Court erred in not permitting cross-examination of Kuehne with respect to the details of the felony of which he had been convicted. The Utah Supreme Court ruled on this issue in State v. Kazda, 14 Utah 2d 266, 382 P.2d 407 (1963). There the Court opined on the right of a prosecutor to question the accused regarding prior felony convictions in relationship to his credibility as a witness. The Court held that when an accused voluntarily takes the witness stand he may be asked whether or not he has been convicted of a felony, and, if he responds in the affirmative, he may be asked only the nature of the felony. The Court ruled that details or circumstances surrounding the felony which the accused was convicted of may not be inquired into except under unusual circumstances, i. e., where the inquiry would tend to show a scheme, plan, modus operandi, or the like. In the case at bar when the prosecutor's objection to the question "What was the weapon?" was sustained by the Court, Sinclair's attorney did not make a specific offer of proof. Accordingly, there is nothing in the record indicating that Kuehne's answer would have met the "unusual circumstances" exceptions referred to in State v. Kazda, *supra*. This court has held that when a witness's credibility has been impeached by his admission of prior felony convictions, it is within the trial court's discretion to refuse to permit further inquiry or to develop extrinsic evidence relative thereto. Butler v. United States, 408 F.2d 1103 (10th Cir. 1969); United States v. Perea, *supra*; Foster v. United States, 282 F.2d 222 (10th Cir. 1960).

Sinclair claims error on the part of the trial court in not permitting certain interrogation of Kuehne on cross-examination relating to his alleged psychiatric record. Defense counsel asked Kuehne whether he had ever gone to psychiatrists for evaluation and treatment. He stated that he had undergone psychiatric evaluation and treatment while in prison as a matter of "standard procedure". He also acknowledged visiting with a psy-chiatrist who lived next door to his family's home in New Jersey, but he denied that this relationship was one of "doctor-patient". Counsel then asked Kuehne whether or not he had been discharged from the army with a "psycho discharge". Kuehne responded negatively. The prosecutor objected on the grounds that the interrogation was without proper foundation. The Court sustained the objection. Thereafter defense counsel submitted an offer of proof indicating that through further cross-examination, with specific reference to certain psychiatrists, dating back to 1948, 1951 and 1959, it would be established that Kuehne was a "psychopathic personality with schizophrenic tendencies and impulse to act out immediately at any time when his ego is involved". The State objected on the grounds that such proof was too remote and had nothing to do with Kuehne's present abilities or condition. Kuehne had already testified that the only time that he had gone to a psychiatrist for evaluation was during his stay in prison, which was a matter of "standard procedure". During the offer of proof, Sinclair made no claim that she could or would produce any hospital, medical or prison records, or that she could or would produce any examining physicians to impeach Kuehne's testimony.

The capacity of a person offered as a witness is presumed, and in order to exclude a witness on the ground of mental or moral incapacity, the existence of the incapacity must be made to appear. Vol. II, Wigmore on Evidence, § 497, 3rd Ed. (1940). The fact of insanity or mental abnormality either at the time of observing the facts which he reports in his testimony, or at the time of testifying, may be provable, on cross-examination or by extrinsic evidence, as bearing on credibility. Foster v. United States, *supra*; Vol. IIIA, Wigmore on Evidence, §§ 931–936 (1940).

Appellant, in this argument, consistently referred to Kuehne as an accomplice. The Trial Court properly instructed the jury on this question. The issue

was then one of fact for jury consideration. But even should we assume that Kuehne was an accomplice, that fact alone would not mean that he was an incompetent witness or that he could not tell the truth. It simply means that his testimony was to be weighed with great care and received with caution. Butler v. United States, *supra*. Sinclair has pointed out, by specific references to the record, that the trial court did not restrain her in presenting oral testimony to the effect that Kuehne's reputation in the community was that of a "compulsive liar".

■ The scope and extent of cross-examination is within the sound discretion of the trial court. Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed. 2d 956 (1968); Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). We hold that the trial court did not abuse its discretion in limiting the cross-examination of Kuehne and that, in no event would the court's rulings constitute plain or fundamental error within the purview of Rule 52(b), Fed.R.Crim.P. Such error has been described by this court as "serious prejudicial error" in the conduct of the trial affecting life or liberty. Whaley v. United States, 394 F.2d 399 (10th Cir. 1968). In determining whether the "plain error" rule should be invoked the appellate court must consider the whole record. Adams v. United States, 375 F.2d 635 (10th Cir. 1967), cert. denied 389 U.S. 880, 88 S.Ct. 117, 19 L.Ed.2d 173 (1967).

## II.

Sinclair contends that she was deprived of due process of law and of her constitutional right against self-incrimination by actions of the trial court and the prosecution relating to questions propounded by the prosecutor to her and LaRae Peterson concerning homosexual acts between them, when the prosecutor knew that they would claim the privilege against self-incrimination. It is further contended that the trial court failed to admonish the jury that no inference may be drawn from the claim of the privilege against self-incrimination, and that the failure to so admonish denied Sinclair her constitutional right against self-incrimination guaranteed by the 5th and 14th Amendments. It is also argued that this error was compounded in its prejudicial effect by statements of the prosecutor in summation.

Sinclair contends that the prosecutor had actual knowledge of the fact that she and LaRae Peterson would claim the privilege against self-incrimination with regard to questions directed to any alleged homosexual relations between them. In support of this contention Sinclair makes reference to her own brief filed on appeal with the Utah Supreme Court. This, of course, is self-serving. A review of the entire record of the State trial proceedings does not indicate that the prosecuting attorney had any foreknowledge that Sinclair or Peterson would claim the privilege.

The State's witnesses, Carl Kuehne, Vaughn Humphries and LaRae Kuehne, each testified to matters indicating a homosexual relationship between Sinclair and LaRae Peterson. Carl Kuehne testified with respect to a conversation which he claimed to have had with Sinclair in which she spoke of killing Don Foster. Kuehne said that he told Sinclair that Vaughn Humphries had remarked that she was a lesbian. The record is replete with references of Sinclair's desire to break up the relationship between LaRae Peterson and the decedent, Don Foster. Both Carl Kuehne and Vaughn Humphries testified that Sinclair suggested that they form a "Danites" committee and proceed to either threaten or actually castrate Foster. Kuehne and his wife, LaRae, testified that Sinclair had informed them that since she had the name of "lesbian" that they should aid her in enticing LaRae Peterson to come to her rest home, at which time she would drug and strip her and "put on a lesbian act", arranging for Foster to witness it. Humphries testified that the lesbian relationship between Sinclair and Peterson was related to him by Thayle Olson who was

employed at Sinclair's rest home. The record establishes that Sinclair often dressed in men's clothing and that she combed her hair straight back similar to that of a man. Her attachment for and affinity toward LaRae Peterson and her deep concern with respect to the relationship between Peterson and the decedent, Don Foster, was firmly established.

LaRae Peterson was called as a prosecution witness. She acknowledged that she had "visited" with Jean Sinclair at Covey's Motel in Salt Lake City on more than one occasion. The prosecutor asked her if she and Jean Sinclair had ever committed any lesbian acts with each other. She invoked the 5th Amendment on the grounds that the answer would tend to incriminate and degrade her. The Court ordered her to respond to the question. She refused to do so. Thereafter she testified that she had received a note from Jean Sinclair and in her handwriting, some time during the month of April, 1962, after she had been going with Don Foster, reading as follows:

"Dearest One:

I love you with all of me. I didn't mean it for a minute (sorry that I ever met you). You know that I didn't live until you loved me. I love, want and need you and your love. Whatever I must do I will do. Please be patient and help me, honey. Your love is all that has kept me going. I promise never to mention the men in your life again. All I want is to have you and Cheryl Ann happy. Please let me.

All my love always.

2:45 a. m."

The letter was admitted in evidence. Ellen McHenry, a partner of Jean Sinclair in the operation of the rest home in Salt Lake City, testified that she hired a private detective to get something on LaRae Peterson and Don Foster, purportedly for the purpose of protecting LaRae's child, Cheryl Ann. She stated that Sinclair knew nothing about the hiring or activities of the private detective. Sinclair's name was brought to the attention of the police in regard to the Foster murder by LaRae Peterson on the afternoon following the shooting.

Jean Sinclair testified in her own behalf. She stated that with respect to the relationship between LaRae Peterson and the decedent, Don Foster, she was simply concerned about Peterson's minor child, Cheryl Ann, who was cared for at the rest home during the long period of time in which LaRae Peterson was "running around" with about 15 different men, including Foster. She believed that the child's affection had turned toward her and Ellen McHenry, in lieu of the normal affection between mother and child. She related that Vaughn Humphries was telling "stories" that she was a "lesbian". She said that she phoned Humphries and told him that if he did not stop making remarks that she was a lesbian, that she would file suit against him. She further testified on direct examination that she had never discussed lesbianism with Carl Kuehne or with any other person. Sinclair opened the door with respect to the subject matter of lesbianism and homosexuality by reason of her own direct testimony. On cross-examination Sinclair stated that the note, in her handwriting and directed to LaRae Peterson, constituted nothing more than the same "feeling" which she had for Ellen McHenry and her children. On further cross she invoked the 5th Amendment in relation to certain questions concerning the note. She did, however, upon the advice of counsel, respond to specific portions of the note. When asked what she meant by "Dearest One" she refused to answer. When asked what she meant by "I love you with all of me" she refused to answer. When asked what she meant by "You know that I didn't live until you loved me" she refused to answer. When asked what she meant by "Your love is all that has kept me going" she refused to answer. Again, during cross-examination the following colloquy took place:

"Q. Have you been in love with LaRae Peterson?

A. What do you mean by that?

Q. Are you a lesbian?

A. Again, will you explain it?

Q. I will ask you if you ever committed any homosexual acts on LaRae or she with you?

A. I refuse to answer this question on the ground that it may tend to incriminate me or degrade me."

During summation the prosecutor made very little comment on the relationship between Sinclair and Peterson. The prosecutor commented simply as follows:

"Now, the question of homosexuality. It has nothing to do with this case and the Court has instructed you only insofar as it might refer to a motive. We are not trying Jean Sinclair for any relationship between LaRae Peterson and herself. But it does come into the case, unfortunately, because it provides a motive."

The Court made it abundantly clear to the jury that neither Sinclair nor LaRae Peterson were on trial for homosexual relations and that any such relations were not connected to the homicide except insofar as they relate to a motive which Sinclair might have had in relationship to the murder of Peterson's boyfriend, Don Foster.

On this appeal Sinclair contends that the State of Utah knew that she would claim the privilege against self-incrimination with regard to any questions relating to homosexuality and nevertheless the State advanced those questions. There is nothing in this record beyond the appellant's own brief filed with the Utah Supreme Court which substantiates this contention. Sinclair has at no time or in anywise before this court acknowledged that she raised the issue. When she testified with respect to the rumors which she attributed to Vaughn Humphries that she was a lesbian, she stated that she contacted Humphries and threatened to file suit against him if he continued to spread the rumors. This testimony was, in effect, a denial of any homosexual relationship with LaRae Peterson. On direct testimony she also denied that she had ever discussed lesbianism with Carl Kuehne, but she said that Kuehne had informed her that Humphries was circulating stories that she was a lesbian. When asked about her conversation with Humphries she testified:

"I told him what I had been told and that Ellen was very unhappy about it as well as I was. I reminded him that he had had problems before and that it wouldn't help him any to have a suit and that we were going to instigate a suit against him if he didn't stop and stop now."

 It is well established that the case of an accused who voluntarily takes the stand, and the case of an accused who refrains from testifying, are vastly different. Johnson v. United States, 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704 (1943). When an accused voluntarily offers testimony upon any fact he waives the privilege against self-incrimination as to that fact and all other relevant facts because of the necessary connection between all. Johnson v. United States, *supra*; Vol. VIII, Wigmore on Evidence, § 2276(2), 3rd Ed., 1940. The rule applies here. An accused may be cross-examined as to subjects already dealt with in his direct examination. In Johnson v. United States, *supra*, at 201, 63 S.Ct. at 555, the Court observed:

"We cannot permit an accused to elect to pursue one course at the trial and then, when that has proved to be unprofitable, to insist on appeal that the course which he rejected at the trial be re-opened to him. However unwise the first choice may have been, the range of waiver is wide. Since the protection which could have been obtained was plainly waived, the accused cannot now be heard to charge the court with depriving him of fair trial. The court only followed the course which he himself helped to chart and in which he acquiesced until the case was argued on appeal."

It seems strange that Sinclair would contend that the prosecutor was put on

notice, in advance of trial, that she would claim the privilege against self-incrimination, and then expect this court to grant her the best of two worlds. If a defendant in a criminal case voluntarily takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination. He has no right to set forth to the jury all of the facts which tend in his favor without laying himself open to a cross-examination on those facts. Fitzpatrick v. United States, 178 U.S. 304, 20 S.Ct. 944, 44 L.Ed. 1078 (1900); Reagan v. United States, 157 U.S. 301, 15 S.Ct. 610, 39 L.Ed. 709 (1895).

In light of the waiver effected by Sinclair relating to the privilege against self-incrimination, she has no standing here to raise the challenge of the privilege applicable to LaRae Peterson. The testimony sought by the prosecution from Sinclair and LaRae Peterson was proper in support of the Government's case going to the vital element of motive involved in the murder of Don Foster. United States v. Eagleston, 417 F.2d 11 (10th Cir. 1969); Moran v. United States, 404 F.2d 663 (10th Cir. 1968). When LaRae Peterson was asked by the prosecutor about any homosexual relationship with Sinclair, she invoked the privilege against self-incrimination. The trial court directed her to answer. She refused to do so. The State was entitled to call LaRae Peterson to testify to non-privileged matters necessary to corroborate the Government's case. The existence of an unnatural relationship between Sinclair and Peterson, together with reasonable inferences to be drawn therefrom, was critical to prove motive. Crimes and transactions not otherwise involved in the principal charge, while otherwise inadmissible, are properly admitted if they tend to establish an element of the principal offense charged. Mills v. United States, 367 F.2d 366 (10th Cir. 1966); Weeks v. United States, 313 F.2d 688 (10th Cir. 1963),

cert. denied 373 U.S. 922, 83 S.Ct. 1523, 10 L.Ed.2d 421 (1963). It does no violence to the privilege that a person's choice to testify in his own behalf may open the door to otherwise inadmissible evidence which is damaging to his case. McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971); Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

In view of Sinclair's waiver we find no merit in her contentions here.

### III.

Sinclair contends that the elimination of persons conscientiously opposed to the death penalty from the jury denied her due process of law and her right to a fair trial.

Sinclair was charged and tried for first degree murder. Utah Code Annotated 1953, § 76–30–4, prescribes the death penalty unless the jury recommends life imprisonment and the Court concurs. Sinclair argues that the de jure exclusion from jury service at her trial of members of the Salt Lake County community who were opposed to the death penalty for moral or religious reasons prevented her from receiving a fair trial, thus constituting a denial of due process of law and equal protection thereof.

In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court held that it is constitutionally impermissible to exclude from jury service those prospective jurors who express conscientious scruples concerning imposition of capital punishment, without inquiring whether under any circumstances the person could impose the death penalty. The Court stated that a man who opposed the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him and can obey the oath he takes as a juror. Sinclair contends that the Supreme Court "sidestepped" the true and central issue. She argues that this court should focus on

the system which permits selection of members of the jury in such a way as to exclude a "significant segment of the community"; that the use of the "death qualified" qualification in the calculus of the trial is inherently unconstitutional, not because the State has produced "a jury uncommonly willing to condemn a man to die", but rather because such a jury is not representative of the community and is not, accordingly, a jury of one's peers. We observe that the United States Supreme Court in *Witherspoon, supra,* did not "sidestep" the issue·as Sinclair claims. The Court specially found that there is insufficient data to establish that jurors not opposed to the death penalty tend to favor the prosecution. Appellant offers no data here.

Sinclair recognizes that Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), controls here and renders her contentions unmeritorious unless this court adopts the same constitutional rule which the Supreme Court rejected in *Witherspoon, supra.* We decline to do so and respectfully suggest that the issue is one more properly for legislative consideration. In *Bumper, supra,* the Court refused to reverse a conviction on a rape charge involving possible capital punishment. The jury recommended life imprisonment and the sentence was so entered. The Court held that its *Witherspoon* decision did not apply because the jury recommended life imprisonment. The same reasoning applies here.

The very purpose of the criminal justice system is that of investigating, charging, trying, convicting and sentencing those who have committed offenses legislatively determined to be violative of the rights of persons and property. Legislators represent a cross-section of the community.

#### IV.

Sinclair argues that certain matters contained in the State's brief filed with the Utah Supreme Court are "purposeful misstatements of fact" relied upon by that Court relating to testimony of police officer LaMar B. Williams and one Boyd K. Harvey. A review of the trial record convinces us that her contentions are without substance.

Sinclair contends that she was denied a fair trial by reason of the trial court's failure to properly admonish the jury and to insulate the jury from "adverse" publicity generated by the trial. The jury was not sequestered. The record does not reflect any request or motion by the defense to sequester. Sinclair recognizes that this is a matter discretionary with the court. She complains of the "prejudicial" publicity of the trial and the "carnival atmosphere" in the courtroom. These matters have been fully litigated in the Utah State courts and reviewed here. We find no merit in these contentions. Where there has been a full and fair evidentiary hearing in the State courts, there is no basis for an evidentiary hearing in the Federal courts on the same issues. Cindle v. Page, 424 F.2d 509 (10th Cir. 1970).

Sinclair argues that the Trial Court's failure to sequester was compounded in error in that "the record demonstrates that the only time that the Trial Court admonished the jury to avoid contact with publicity was at the time when the jury was selected on April 15, 1963." The record is replete with the official reporter's notes entered prior to each recess and continuance that the Court "admonished" the jury. And near the end of trial defense counsel volunteered to the Court: "I agree and stipulate that the admonition to the jury at each recess or each continuance has been proper." R. 1549.

We concur in the finding that Sinclair was not deprived of her right to a fair trial and that she has received full and fair evidentiary hearings in the Utah State courts.

We affirm.