**STATE of Utah, Plaintiff and Respondent,**

v.

**Robert Lee SALES, Defendant and Appellant.**

**No. 13754.**

Supreme Court of Utah.

July 11, 1975.

Maurice Richards, John T. Caine, Reed M. Richards, Public Defender Assn. of Weber County, Ogden, for defendant and appellant.

Vernon B. Romney, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

CROCKETT, Justice:

Robert Lee Sales seeks reversal of his conviction of murder in the first degree and sentence of life imprisonment thereon for the killing of JoAnn Poulsen, committed on August 21, 1971. His claims of error center upon the contention that there had been so much publicity about the case that he could not and did not have a fair trial by an impartial jury in Weber County.[1]

The victim, JoAnn Poulsen, 19 years of age, was last seen by her friends in Ogden at about 1:30 a. m. on August 20, 1971. Upon her failure to return to her home in Tremonton the authorities were notified. Continuous search and inquiry failed to locate her. In one of them the Weber County Sheriff's Department used scuba divers and sonar equipment in the Pine View Reservoir without success. Notwithstanding continued search and inquiry the whereabouts of the missing girl and her automobile continued to be a mystery.

About one year after her disappearance, in August 1972, her parents offered a $1,000 reward for any information that would lead to finding her. At that time the defendant was in the Weber County Jail

---

1. Defendant cites and relied on Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed. 2d 543; Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663; Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600.

awaiting extradition to Montana on charges of first-degree murder and other crimes.[2] By what now seems a strange and unusual quirk in human behavior, he attempted to obtain that reward. He informed officials that he could tell them where to locate the girl's body; and by the use of a map gave a precise description of where the car would be found. By following his directions the car was located and removed from the Pine View Reservoir. The body of JoAnn was found in the trunk with a brassiere wrapped tightly around her neck. A pathologist testified that her death had resulted from strangulation.

We think it unnecessary and undesirable to burden the printed page with any extensive account of the evidence presented during this protracted trial which lastly nearly three weeks (12 trial days) and in which 42 witnesses were called, except a brief summary of some significant aspects thereof. One of these was the testimony of the defendant's own brother. He related that he received a phone call from defendant in the early morning hours of the night of Miss Poulsen's disappearance, that defendant asked him to pick him up at the Pine View Dam; and that he did so a block or two from where the car was later taken from the water. The brother returned Sales to his car located on the main highway between Ogden and Tremonton.

A friend of the defendant testified that the defendant told her he had put Miss Poulsen in the trunk of her car and dumped her car in the water. Another friend testified that defendant told him that defendant had killed a girl, put her in the trunk of her car, and pushed the car in the dam. An inmate of the jail testified that the defendant described to him how he had had car trouble, got a ride with Miss Poulsen, pulled a knife on her, had intercourse with her, strangled her with her

bra, put the body in the trunk of her car, drove it to Pine View and pushed it over the edge.

It will be seen from the foregoing that there is no serious question about whether there is sufficient evidence to justify the jury's finding beyond a reasonable doubt that defendant was guilty of the crime.

The mystery of the disappearance and the frustrations in searching for the missing girl were a matter of great anxiety to everyone. It is true, as it is but natural to expect, that there was considerable publicity in all news media. For example, with respect to newspaper publicity in the immediate area: It is shown that the Ogden Standard-Examiner, the leading newspaper in that area, which goes to approximately 80 per cent of Ogden's homes, published a total of 40 articles about JoAnn's disappearance, the finding of her body and other details concerning the arrest, trial and conviction of the defendant. There was similar coverage in many broadcasts over the area radio and television stations.

When the case was first set for trial in October 1973, the court granted a defense motion for a continuance to allow the effect of publicity to lessen. In January 1974, a similar motion was made, or in the alternative, for a change of venue. But the publicity had been so pervasive that similar difficulties would have existed elsewhere and the court denied the motion.

The trial commenced and the process of jury selection began on January 7, 1974. It is of course not to be supposed that any intelligent person in the area had not been aware of the publicity concerning this crime.[3] In the voir dire questioning of about 60 prospective jurors, the trial court correctly took the view that mere knowledge about the case was not disqualifying; but that what was required was that a juror had not formed nor expressed any opinion

---

2. He has since been convicted of kidnapping and is serving a life term in the Montana State Prison.

3. We gave consideration to similar contentions in the case of Sinclair v. Turner, 20 Utah 2d 126, 434 P.2d 305; the observations there made are applicable here.

as to the guilt or innocence of the defendant; and that he had a sincere conviction that he could set aside any prior information or impressions, and try the case fairly, impartially and solely upon the evidence adduced in court. Upon their responses to questions searching this attitude, many of the jurors were excused for cause. But as a result of careful questioning a panel of 32 jurors whose answers manifest conformity with the standard just set forth were qualified. From them 12 were chosen and swore on their solemn oaths that they would so fairly and impartially try the case solely upon the evidence.

■ We have no desire to in any way disparage or minimize the right to a trial by a fair and impartial jury. We reiterate what has often been said: that it is a sacred part of our heritage, which should be zealously safeguarded by the courts.[4] Nevertheless, defendant's urgence of his right to a trial by a jury free from exposure to publicity and the possibility of being influenced by it must be considered in the light of the practical aspects of reality. These include the fact that in a free and democratic society the citizens from whom a jury must be chosen cannot exist in a vacuum of isolation. And further, that no one of the fundamental and assured rights can be considered alone and without regard to others. Witness: the right to life itself is so limited in the face of threat or war or certain other calamities. This is even more true of other rights. They are all interrelated; and the assurance of

each often requires restraint and forbearance in respect to others.

Accordingly, the right to have a trial by a jury free from the influences of publicity must be considered in relation to the rights of freedom of speech and of the press,[5] and their corollary, the right of the people to know what is going on in public affairs. The object to be desired is to avoid any evils which may result from arrogant insistence upon any one right to the exclusion or unreasonable impairment of the others. This objective is best served by attempting to maintain that degree of accommodation and balance between these interrelated rights which will allow the enjoyment of each of them to the highest possible degree consistent with similar respect for the others.

■ When the foregoing considerations are taken into account as applied to the conduct of this trial, it is our judgment that the trial court exercised commendable care to determine that despite whatever jurors may have been made aware of concerning the charged offense through publicity, they conscientiously believed that they could set it aside and act without bias or prejudice as fair and impartial jurors.[6] Consequently, it is our conclusion that there is no error which would warrant reversal of the conviction.[7]

Affirmed. No costs awarded.

HENRIOD, C. J., and ELLETT, TUCKETT and MAUGHAN, JJ., concur.

---

4. E. g. See statement by Justice Murphy in Jacob v. City of New York, 315 U.S. 752, 753, 62 S.Ct. 854, 86 L.Ed. 1166.

5. See Constitution of Utah, Art. I, Sec. 15; Constitution of the United States, Amendment I.

6. That a person of that frame of mind is not disqualified as a juror see Sec. 77–30–21, U.C.A.1953; and that this is primarily for

the trial court to determine see State v. BeBee, 110 Utah 484, 175 P.2d 478.

7. That there should be no reversal unless there is error which is substantial and prejudicial so that injustice results, see Sec. 77–42–1, U.C.A.1953; State v. Lyman, 10 Utah 2d 58, 348 P.2d 340, and Murphy v. Florida, —— U.S. ——, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).